**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01038-CMA-CBS (Consolidated for all purposes with
Civil Action No. 12-cv-01521-CMA-CBS)

PATIPAN NAKKHUMPUN, Individually and on behalf of all others similarly situated,

      Plaintiff,

v.

DANIEL J. TAYLOR,
JOHN R. WALLACE,
CARL E. LAKEY, and
KEVIN K. NANKE,

      Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

---

This matter is before the Court on Plaintiffs' motion for leave to amend their consolidated complaint.  (Doc. # 50.)  Defendants filed their response on November 18, 2013 (Doc. # 53), and Plaintiffs filed their reply on December 5, 2013 (Doc. # 54).  Plaintiffs' motion is ripe for review.

## I.  BACKGROUND

This is a securities fraud class action in which a class of former shareholders of Delta Petroleum Corporation ("Delta" or the "Company") alleges that some of the Company's former officers and directors violated Securities Exchange Act §§ 10(b) and 20(a) and S.E.C. Rule 10b-5.  (Doc. # 36.)  On September 30, 2013, the Court granted Defendants' Motion to Dismiss the entire complaint, concluding that Plaintiffs failed to

allege all elements[1] required to state a claim under Rule 10b-5 with respect to each

alleged instance of prohibited conduct.  *See Nakkhumpun v. Taylor*, 2013 WL 5446081

(D. Colo. 2013) (unpublished).  However, the Court also afforded Plaintiffs the

opportunity to overcome the pleading deficiencies via an amended complaint.

Accordingly, Plaintiffs filed the instant Motion for Leave to Amend on October 28, 2013,

along with their Proposed Amended Complaint ("PAC").  (Doc. # 51.)

## II.  STANDARD OF REVIEW

In considering whether to grant Plaintiffs' motion for leave to amend their

complaint, the Court "should freely grant leave [if] justice so requires."  Fed. R. Civ. P.

15(a)(2).  However, the Court "may refuse to allow amendment if it would be futile."

*Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (citation omitted).

Amendment would be futile if, even after making the proposed amendments, the

complaint would be subject to dismissal.  *Id.* (citation omitted).

This inquiry requires the Court to evaluate the PAC in its entirety, *Adams v.*

*Kinder-Morgan, Inc.*, 340 F.3d 1083, 1092 (10th Cir. 2003), to accept the PAC's well-

pleaded allegations as true, and to construe them in the Plaintiffs' favor.  *See Williams*

*v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991).  But bare, conclusory allegations that lack

a factual basis will receive no favorable review or construction.  *See Brown v. Zavaras*,

63 F.3d 967, 972 (10th Cir. 1995); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[1]     To state a claim under Rule 10b-5 for securities fraud, a plaintiff must allege that:
"(1) the defendant made an untrue or misleading statement of material fact, or failed to state
a material fact necessary to make statements not misleading; (2) the statement complained of
was made in connection with the purchase or sale of securities; (3) the defendant acted with
*scienter,* that is, with the intent to defraud or recklessness; (4) the plaintiff relied on the
misleading statements; and (5) the plaintiff suffered damages as a result of his reliance."
*Adams*, 340 F.3d at 1095.

2

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  To avoid dismissal under Rule 12(b)(6), the PAC must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  The PAC must raise more than a "sheer possibility" that Defendants violated Rule 10b-5.  *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted).

Because the PAC alleges securities fraud, it must "state with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b).  That requires stating the "time, place, and contents of the false representation, and the identity" of the statement's maker.  *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 726-27 (10th Cir. 2006) (quotation marks and citations omitted). In addition, the PAC must specify "the reason or reasons the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  With respect to the scienter requirement, the PAC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Notwithstanding the heightened pleading standards dictated by Rule 9(b) and 15 U.S.C. § 78u-4(b), pleadings should be "simple, concise, and direct, and [should] be construed as to do substantial justice," *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quotation marks, citation, and lacuna omitted), and the "concept of notice pleading" remains intact.  *Adams*, 340 F.3d at 1095-96 (observing that the "PSLRA did not . . . purport to move up the trial to the pleading stage").

## III. DISCUSSION

In seeking leave to amend, Plaintiffs argue that the PAC would overcome two deficiencies that doomed several of their claims in the initial Amended Complaint ("AC"). First, with respect to Defendants' alleged misstatements concerning the reason Delta's negotiations with Opon ended, Plaintiffs offer a new theory of loss causation. Second, they seek to revive claims based on alleged misstatements concerning improvements in Delta's liquidity and financial condition by articulating a new reason that those statements were false or misleading. The Court considers each of these proposed amendments in turn, ultimately concluding that none of the claims Plaintiffs seek to revive could survive a motion to dismiss.

### A. STATEMENTS CONCERNING REASONS OPON NEGOTIATIONS TERMINATED

#### 1. Initial Allegations and the Court's Order

On March 18, 2010, Defendants announced publicly that Delta had entered a "non-binding letter of intent" to sell a portion of its Vega Assets to Opon International ("Opon") for $400 million. (Doc. # 36 at 36.) The announcement also indicated that Delta and Opon were negotiating with hopes of reaching a definitive agreement. (*Id.*) Defendants subsequently announced on May 10, 2010, and June 1, 2010, that those negotiations were still moving forward. (*Id.* at 37, 43.) Then, on July 7, 2010, Defendants announced that negotiations had ended, explaining that "Opon was unable to obtain financing for the transaction on the agreed upon terms" and that "Opon was unable to arrange financing for a transaction on terms acceptable to us." (*Id.* at 44-45.)

In their AC, Plaintiffs alleged that Defendants' July 7, 2010 announcement misled the public concerning the reason negotiations ended.  According to Plaintiffs, Defendants' explanations concealed the true reason negotiations ended, namely, that Opon had backed away from the proposed $400 million price.  (*Id.* at 44-45.)  In its September 30, 2013 Order (the "Order"), the Court agreed that Plaintiffs had adequately alleged the statement was misleading, observing that it was bound to construe the allegations in the light most favorable to the plaintiffs.  *Nakkhumpun*, 2013 WL 5446081, at *17.  The Court reasoned that Defendants' statements reasonably could have been interpreted to mean that negotiations ended because financing was unavailable, which would have been inconsistent with the reason Plaintiffs allege to be true.  *Id.*[2]

Nonetheless, the Court dismissed Plaintiffs' claim based on the July 7, 2010 statement because Plaintiffs' allegations failed to show that the misstatement caused their losses.  *Id.* at *17-18.  Plaintiffs argued generally that the misstatement artificially propped up Delta's share price until November 9, 2011, when Defendants disclosed the $420.1 million impairment of the Vega Assets and the likelihood of bankruptcy. Plaintiffs alleged that those disclosures corrected the misstatement and caused the share price to decline significantly the following day.  (Doc. # 42 at 29.)  The Court rejected that argument, however, because neither the asset impairment nor the announcement concerning the likelihood of bankruptcy related back to, and thus corrected, the alleged misstatement.  *Nakkhumpun*, 2013 WL 5446081, at *17-18.

---

[2]      The Court assumed, without deciding, that the AC adequately alleged scienter. *Id.* at *17 n.7.

In the instant motion, Plaintiff packages essentially the same facts in a new theory of loss causation called "materialization of the concealed risk." (Doc. # 51 at 8-11.)  *See also In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Before evaluating whether Plaintiff's new theory could plausibly suggest that Defendants' alleged misstatement caused Plaintiffs' losses, the Court will review the legal standards applicable to the "materialization of the concealed risk" theory of loss causation.

2.      Legal Standards of the "Materialization of the Concealed Risk" Theory

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 of the United States Code), requires a private plaintiff asserting a Rule 10b-5 action to prove that the defendant's act or omission "caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  This "loss causation" element establishes "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Emergent Capital Inv. Mgmt. LLC, v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

A plaintiff must allege loss causation in the complaint.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  That means alleging "something beyond the mere possibility of loss causation."  *Twombly*, 550 U.S. at 557-58 (quoting *Dura*, 544 U.S. at 347).  Indeed, the plaintiff must allege "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss."

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255-58 (5th Cir. 2009) (discussing *Dura*
and *Twombly*).

The materialization of the concealed risk theory allows a plaintiff to plead loss
causation by alleging that the defendant's misstatement fraudulently concealed a risk
that subsequently materialized to cause the plaintiff's loss. *See Lentell*, 396 F.3d at
172-73 (citations omitted). This theory requires a plaintiff to allege two things. First,
the plaintiff must allege that the risk that caused the loss was within the zone of risk
concealed by the misrepresentation. *See id.* at 173. Second, the plaintiff must allege
that the plaintiff's security lost value because the concealed risk materialized. *See id.*
This causal "relationship between the plaintiff's investment loss and the information
misstated or concealed by the defendant" must be "sufficiently direct" and not
"attenuated." *Id.* at 174 (summarizing Second Circuit precedents).

The passage of time and intervening factors may preclude establishing that
a concealed risk caused a loss. *In re Williams*, 558 F.3d at 1143. In *Williams*, the
defendants—officers and directors of a parent company—allegedly misrepresented
(1) the reasons for spinning off a subsidiary; (2) the subsidiary's chances of survival
after the spin-off; and (3) the adequacy of the subsidiary's capitalization. 558 F.3d at
1133. They told the public that the subsidiary and parent each had great prospects
that could be pursued best as separate companies. *Id.* They also publicly cheered the
subsidiary's strong position and adequate financial resources. *Id.* In fact, however, the
defendants wanted to get rid of the subsidiary, whose capital needs and growing debt
were a drain on the parent company's balance sheet. *Id.* Nineteen months after the

spin-off was announced, the former subsidiary disclosed that it was considering bankruptcy and, about two months after that, declared bankruptcy.  The Tenth Circuit held that the "causal relationship between the . . . false statements and [the subsidiary's] eventual bankruptcy years later [was] too remote to constitute a corrective disclosure."  *Id.* at 1142-43.  Although WCG's bankruptcy may have been a likely possibility at the time of the spin-off and misstatement, there were "too many intervening causes to say that bankruptcy was [the subsidiary's] legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spin-off was announced."  *Id.* at 1143.

The Court must distinguish carefully between truly corrective disclosures and "every bit of negative information" about Delta that is allegedly connected to the "initial misrepresentation that overstated [Delta's] chances of success."  *See id.* at 1140. The federal securities laws' anti-fraud provisions do not "provide investors with broad insurance against market losses, but . . . protect[s] them against those market losses that misrepresentations actually cause."  *Dura*, 544 U.S. at 345.  At the same time, the standard applied must not be too exacting.  *In re Williams*, 558 F.3d at 1140.

3.    Loss Causation Analysis of Plaintiff's Proposed Amendments

The fact allegedly concealed by Defendants' misstatement was that Delta's negotiations with Opon ended because Opon had backed away from the $400 million price and offered a lower price that Delta would not accept.  (Doc. # 48 at 36-37.) In their motion to amend, Plaintiffs identify three specific risks that they argue were within the zone of risk concealed by Defendants' July 7, 2010 misstatement: (1) the

Vega Assets were not worth $400 million, (2) the Vega Assets were not marketable at or near the $400 million price, and (3) Delta's inability to sell the assets at a sufficiently high price would force it to file for bankruptcy.  (Doc. # 51 at 11.)  According to Plaintiff, those risks materialized when Defendants disclosed approximately sixteen months later, on November 9, 2011, that (1) it had not received an offer to buy the assets for an adequate price, and (2) it would have to file for bankruptcy as a result.  (*Id.*)

Having considered these allegations, the Court concludes that only the second risk was within the zone of risk concealed by Defendants' misstatement.  With respect to the first risk alleged concerning the value of the Vega Assets, Defendants owed no legal duty to disclose the value that Opon allegedly assigned to those assets.  As the Court observed in its Order, "the opinion of a separate entity about the value of a corporation's assets need not be disclosed.  That is especially so when, as here, the separate entity's interest is directly opposed to that of the corporation."  *Nakkhumpun*, 2013 WL 5446081, at *15 n.6.  Without a duty to disclose, this alleged omission cannot support Plaintiffs' Rule 10b-5 claim.

The third risk alleged—that Delta would enter bankruptcy—was not within the zone of risk concealed by Defendants' alleged misrepresentation.  Though Delta's bankruptcy might have been possible or even likely on July 7, 2010, when Defendants made the allegedly misleading statement, there were too many intervening events to say that bankruptcy was a legally foreseeable result of that misstatement.  *See In re Williams*, 558 F.3d at 1143.  For example, in July 2011, with the help of investment banks Macquarie Capital and Evercore Group, Delta initiated another search for a

9

strategic transaction that would maximize shareholder value and reduce Delta's debt. (Doc. # 51-2 at 13.)  That search included sending marketing materials to seventy-six potential strategic partners, twenty of whom signed confidentiality agreements and received offering memoranda.  Eight of those twenty participated in data room presentations and engaged in due diligence.  Delta's chief restructuring officer described the marketing process, which lasted several months, as "extensive and thorough."  (*Id.* at 14.)  In fact, it was the unsuccessful end of this 2011 campaign, not the 2010 campaign, that Delta referenced when disclosing on November 9, 2011, that no adequate offer had materialized for Delta or its assets.  (*See id.* at 88.)  Considering these intervening events, it is implausible that Delta's eventual announcement of a likely bankruptcy was the foreseeable result of Opon's rejection of the $400 million price sixteen months earlier.

Only the second risk alleged—the risk that Opon might not sell the Vega Assets for a price at or near $400 million—was within the zone of risk concealed by Defendants.  *See Nakkhumpun*, 2013 WL 5446081, at *17 (Defendants' "misstatement concealed the risk that the assets might not fetch as high a price as Delta and its shareholders hoped.")  In light of the "extensive and thorough" search for a strategic transaction that occurred during the sixteen months between Defendants' misstatement and the announcement that allegedly constituted the materialization, it appears to the Court that the relationship between the loss and the risk concealed was too "attenuated" and insufficiently "direct."  *See Lentell*, 396 F.3d at 174.  However, whether an

intervening event broke the chain of causation is a fact issue the Court should not decide on a Rule 12(b)(6) motion to dismiss.  *See id.*

Nevertheless, notwithstanding the causation issue, the PAC could not survive a Rule 12(b)(6) motion because it fails to allege a strong inference that Defendants made this statement with scienter.

    4.   <u>Strong Inference of Scienter</u>

Plaintiffs must allege facts that would give rise to a strong inference that Defendants acted with scienter when they failed to disclose that negotiations with Opon ended because Opon was unwilling to pay $400 million.[3]  *See* 15 U.S.C. § 78u-4(b)(2). To establish scienter, Plaintiffs must allege that Defendants acted with knowledge or reckless indifference to the chance that the statement would mislead investors; negligence does not suffice.  *See In re Level 3 Comm's, Inc. Sec. Litig.*, 667 F.3d 1331, 1344-45 (10th Cir. 2012) (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008)); *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1264 (10th Cir. 2001) (citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)).

In its prior Order, the Court recognized two inferences that reasonable investors could have drawn from Defendants' July 7, 2010 explanation concerning the termination of negotiations.  Of those inferences, one was inconsistent with what Plaintiffs allege to be the true explanation.  Consistent with the Court's obligation to construe the factual allegations in Plaintiffs' favor, the Court concluded that Defendants' alleged statement

---

[3]    In its prior Order, the Court did not decide whether the AC met the scienter requirement. *See Nakkhumpun*, 2013 WL 5446081, at *17 n.7.

was plausibly misleading.  Plaintiffs alleged "more than a sheer possibility" that the July 7, 2010 statement was misleading.  *Nakkhumpun*, 2013 WL 5446081, at *17 (citing *Iqbal*, 556 U.S. at 678).

But a bare, plausible inference that a defendant acted with the requisite state of mind falls short of the required **strong inference**.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In evaluating allegations of scienter, the Court compares the plaintiff's proposed inference that the defendant acted with the culpable state of mind with "nonculpable explanations for the defendant's conduct."  *Id.* at 323-24.  A complaint raises a strong inference of scienter only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

In this case, Plaintiffs allege that Defendants misstated the reason that the Opon negotiations broke down in order to "signal[] to potential strategic partners—and, consequently, to mislead shareholders—that the announced $400 million price accurately reflected the value of those assets."  (Doc. # 51-2 at 101.)  Plaintiffs also allege that Defendants were motivated to present potential buyers with an "appealing investment."  (*Id.* at 97.)  These allegations all but concede that misleading shareholders was only a side-effect of Defendants' efforts to obtain the best outcome for those shareholders.  Announcing publicly that Opon had offered a lower price almost certainly would have prompted other potential buyers to lower their bids, likely devastating any remaining chance for Delta to sell the assets for a price in the neighborhood of $400 million.  In order to fulfill their fiduciary duties to maximize

shareholder value, Defendants were obligated to carefully craft the July 7, 2010 disclosure to avoid that outcome.  *Cf. Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1993) (When pursuing a sale or change of control transaction, directors must act "reasonably to seek the transaction offering the best value reasonably available to the stockholders.")  Considering this probable reason for Defendants' July 7, 2010 statement, along with the fact that even a close reading of the July 7, 2010 statement only plausibly suggests that the statement was misleading, the strongest available inference is that Defendants may have been negligent concerning the possibility that their statement would mislead shareholders.  *Cf. In re Level 3*, 667 F.3d at 1345 (reasoning that the court's difficulty finding the statement misleading suggested negligence at most).

In addition to this circumstantial evidence of scienter, "motive can be a relevant consideration" and "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 551 U.S. at 325.  "But general motives for management to further the interests of the corporation fail to raise an inference of scienter."  *In re Level 3*, 667 F.3d at 1346.  Plaintiffs allege that Defendants issued the misleading statement to present an "appealing investment" opportunity to potential buyers so that they could keep the company afloat and thus continue receiving their then-existing generous compensation.  (Doc. # 51-2 at 97.)  This alleged motive falls far short of raising an inference of scienter.  *See In re Level 3*, 667 F.3d at 1346 (holding that even compensation tied to stock performance "does not ordinarily indicate scienter").

Therefore, the Court concludes that the PAC fails to raise a strong inference that Defendants made the July 7, 2010 statement with knowledge of or reckless indifference to the possibility it could mislead shareholders.

**B.  FALSITY OF STATEMENTS CONCERNING LIQUIDITY AND FINANCIAL CONDITION**

The Court now turns to Plaintiffs' attempts to revive their claims based on allegations that Defendants made fraudulent statements concerning Delta's liquidity and financial condition in March 2010 and March 2011.  In the AC, Plaintiffs alleged that two statements made by Defendant Wallace on March 11, 2010, and one statement by Defendant Lakey on March 16, 2011, were materially false or misleading.  In its Order, the Court held that the AC failed to allege that these three statements were false or misleading.  Plaintiffs argue that their PAC overcomes the inadequate allegations of falsity.

1.  <u>Defendant Wallace's March 11, 2010 Statements</u>

First, in a March 11, 2010 press release describing Delta's results from the previous year and quarter, Defendant Wallace stated that Delta's "liquidity situation ha[d] also improved materially."  (Doc. # 35 at 33.)  In its Order, the Court reasoned that Defendant Wallace's statement essentially summarized "the several ways Delta's liquidity had improved."  (Doc. # 48 at 15.)  Because Plaintiffs failed to allege that any of the specific improvements summarized were false, the Court concluded that Plaintiffs had failed to plead the statement was false.  (*Id.*)

Second, in an investor conference call that also occurred on March 11, 2010, Defendant Wallace asserted that the Company was in "a far better liquidity and financial

14

situation" than at the same time the previous year.  (Doc. # 35 at 34.)  The Court reasoned that the statement communicated only that Delta's liquidity and financial condition were far better on March 11, 2010, the day Defendant Wallace made the statement, than one year earlier.  (Doc. # 48 at 15.)  The Court concluded that the alleged "more acute" problems and debt default that occurred in the intervening year failed to contradict the proposition that the Company's liquidity and financial situation was better in March 2010 than March 2009.  (*Id.* at 15-16.)

To overcome these deficiencies, Plaintiffs first add a factual clarification, alleging specifically that Delta experienced more acute liquidity problems and defaulted on its credit facility **before** Defendant Wallace made the March 11, 2010 statements.  (Doc. # 51 at 13.)  The clarification adds to Plaintiffs' other allegations that Delta faced serious challenges during the year between March 2009 and March 2010.  However, it does not cast doubt on the specific improvements summarized in the first statement or contradict the proposition that Delta's liquidity position was better on March 11, 2010, than a year earlier.  Consequently, the factual clarification does not alter the conclusion the Court reached in its Order.  *See Nakkhumpun*, 2013 WL 5446081 at *7.

Aside from the factual clarification, Plaintiffs also articulate a new reason that Defendant Wallace's statements were false by focusing on the words "materially" and "far better."  (Doc. # 51 at 14.)  Specifically, Plaintiffs argue that Delta's liquidity position deteriorated so much between March 2009 and March 2010 that, even if it was accurate to summarize specific events in 2009 as having improved Delta's liquidity, it was false to characterize the improvement as a "material" one.  Likewise, even if Delta's liquidity and

financial condition did improve between March 2009 and March 2010, it was false to say that Delta's liquidity and financial position were "far better" in March 2010 than March 2009.  (*Id.* at 14.)

In its previous Order, the Court deemed Defendant Wallace's statements material for the specific reason that they used the terms "liquidity" and "cash flow," which have "set meanings" and thus can be objectively verified.  *Nakkhumpun*, 2013 WL 5446081 at *6.  The objectively verifiable portions of these representations were that the "liquidity situation ha[d] also improved" and that Delta was in a "better liquidity and financial situation."  In contrast, the adjectives "materially" and "far" are immaterial statements of corporate optimism that are incapable of objective verification.  *See In re Gold Resource Corp. Sec. Litig.*, --- F. Supp. 2d ----, ----, 2013 WL 3724918, at *13 (D. Colo. 2013) ("[L]abeling the production rate as 'record' or the growth rate as 'aggressive' is a good example of 'corporate optimism' or 'mere puffing' that is 'not capable of objective verification.'" (quoting *Grossman v. Novell*, 120 F.3d 1112, 1119 (10th Cir. 1997)).  Therefore, Plaintiffs' new theory fails not on the falsity element but on the materiality element.[4]

2.      Defendant Lakey's March 16, 2011 Statement

Finally, the Court turns to Defendant Lakey's statement on March 16, 2011: "These new cost control measures substantially improve our EBITDAX and cash flow which, combined with increased production at the Vega Area, provide value to our

---

[4]      The Court notes that because these adjectives are not subject to objective verification it would be difficult to determine whether a reasonable investor would find the characterizations inconsistent with the facts on the ground.  *See In re Level 3*, 667 F.3d at 1342.

shareholders." (Doc. ## 36 at 57; 51-1 at 66.)  In its Order, the Court concluded that,

although asserting a substantial improvement in cash flow was material, Plaintiffs failed

to adequately plead that the statement was false.  (Doc. # 48 at 13, 16.)  That was

because the facts alleged to be inconsistent with Defendants' statement consisted

of conclusory allegations and lacked substantiating facts.  (*Id.* at 17.)

       To correct the deficiency, Plaintiffs have added three, more specific allegations,

but not one is inconsistent with Defendants' statement.  The statement expressly

attributes the substantial improvement in cash flow to Delta's implementation of new

cost controls.  (Doc. # 36 at 57.)  Notably, Defendants did not state only that cash flow

substantially improved, but rather that "new cost control measures" had improved cash

flow.  For that statement to be false, Plaintiffs would have to allege facts showing that

the cost control measures did not substantially improve Delta's cash flow.  Plaintiffs

supplemented the AC with allegations (1) that Delta  held checks past due; (2) that its

senior lenders assigned their rights in Delta's debts to Macquarie because they were

"fatigued" with Delta's inability to pay, and (3) that Delta was "desperately seeking

strategic alternatives and was 'talking about anything that would stick to the wall.'"

Because none of these indicates anything about cost control measures or their impact

on cash flow, not one is inconsistent with Defendants' statement.  Therefore, the PAC

fails to allege that Defendant Lakey's March 16, 2011 statement was false.

## IV. **CONCLUSION**

For the foregoing reasons, it is ORDERED that Plaintiffs' motion to amend

(Doc. # 51) is DENIED.  It is FURTHER ORDERED that Plaintiffs' motion to vacate

or reconsider the final judgment entered in this case (Doc. # 50) is DENIED as moot.

DATED:  January  29 , 2014

BY THE COURT:

_____

CHRISTINE M. ARGUELLO
United States District Judge