**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01038-CMA-CBS (Consolidated for all purposes with
Civil Action No. 12-cv-01521-CMA-CBS)

PATIPAN NAKKHUMPUN, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

DANIEL J. TAYLOR

      Defendant.

_____

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**
_____

Lead Plaintiff Patipan Nakkhumpun ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Delta Petroleum Corporation ("Delta" or the "Company"), securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of Delta, media reports about the Company and pleadings and documents filed in *In re Delta Petroleum Corporation*, No. 11-14006-KJC (D. Del. Bkpty). Additionally, Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Delta during the period March 11, 2010 through November 9, 2011, inclusive (the "Class Period") for violations of the Securities Exchange Act of 1934 ( the "Exchange Act").[1]

2.      Delta is an independent oil and gas company engaged primarily in the exploration for, and the acquisition, development, production, and sale of, natural gas and crude oil.  Its core area of operations is the Rocky Mountain region, where its proved reserves and production are located. The Company is headquartered in Denver, Colorado.

3.      During the Class Period, Defendant Daniel Taylor ("Defendant" or "Taylor"), who served as Chairman of Delta's Board of Directors throughout the Class Period,

---

[1] Delta is not a defendant in this lawsuit due to its filing, on December 16, 2011, for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

issued materially false and misleading statements regarding the Company's business, the value of its assets, and the prospects of securing a deal with a strategic partner.   Most notably, Defendant issued materially misleading statements regarding a prospective deal with Opon International, LLC ("Opon"), whereby Delta was to sell 37.5% of its Vega Area assets to Opon for $400 million.   As a result of Defendant's false or misleading statements, Delta stock traded at artificially inflated prices during the Class Period, reaching a high of $19.50 per share on March 18, 2010.[2]

4.      On November 9, 2011, Delta announced its third quarter 2011 financial results.   The Company reported a net loss of ($429.4) million, or ($15.40) diluted earnings per share ("EPS"), for the quarter ended September 30, 2011. The significant loss was due mostly to a $420.1 million impairment of proved and unproved property in the Vega Area of the Piceance Basin in Western Colorado.   Specifically, the Company recorded an impairment of $157.5 million of its Vega area unproved leasehold, $239.8 million of its Vega area proved properties, and $2.1 million of its Vega area surface acreage.   The Company additionally provided an update on its strategic alternatives process, advising that the Company had not received any offers to purchase the Company or its "assets that implies a value of its assets that is greater than its aggregate indebtedness…."   As a result, Delta would be forced to restructure its indebtedness. Delta further warned investors that should it be unsuccessful in achieving a transaction or transactions addressing the Company's liquidity, it would be forced to seek protection under Chapter 11 of the U.S. Bankruptcy Code.

---

[2] On July 13, 2011, Delta executed a 10-for-1 reverse stock split.   The stock prices and stock ownerships cited in this Complaint are adjusted for the stock split.

5.     On this news, Delta stock collapsed $1.34 per share to close at $0.71 per share on November 10, 2011, a one-day decline of 65% on volume of nearly 4.5 million shares.

6.     On December 16, 2011, Delta announced that it, along with its affiliates, had filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Court.

7.     Throughout the Class Period, Defendant made false and/or misleading statements by: (1) overstating the value of its Vega Area assets; and (2) misleading shareholders into thinking that the prospects of obtaining a favorable outcome through strategic alternatives were better than Defendant knew or, in the absence of recklessness, should have known.   Additionally, Defendant made materially false and/or misleading statements in that he failed to disclose that: (1) Delta's anticipated and much touted $400 million asset sale to Opon International, LLC ("Opon") had been terminated and would not be completed for the initially announced price; (2) Opon terminated the $400 million asset purchase based on Opon's determination that Delta's Vega assets were worth substantially less; and (3) the Company's assets were severely impaired.

8.     As a result of Defendant's material misrepresentations and omissions, Delta's common stock traded at artificially inflated prices during the Class Period. However, after the above facts were revealed to the market, the Company's shares were hammered by massive sales, sending them down 94% from their Class Period high.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by §27 of the 1934 Act.   The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

10. Venue is proper in this District pursuant to §27 of the Exchange Act. Delta is headquartered in Denver, Colorado, and many of the false and misleading statements were disseminated within this District.

11. In connection with the acts alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12. Plaintiff purchased the common stock of Delta during the Class Period as set forth in the certification previously filed with the Court and was damaged as a result of Defendant's wrongdoing as alleged in this Complaint.

13. Delta was an oil and gas exploration and development company based in Denver, Colorado. The Company's core area of operations was the Rocky Mountain region, where the majority of its proved reserves, production and long-term growth prospects were located. The Company's principal executive offices were located at 370 17th Street, Suite 4300, Denver, Colorado.

14. Defendant Taylor was, at all relevant times, Chairman of the Board of Delta. Taylor was, at all relevant times, an executive of Tracinda Corporation ("Tracinda") and was designated for nomination for election to the Board by Tracinda. During the Class Period, Tracinda owned approximately 33% of Delta's outstanding shares. Taylor personally owned hundreds of thousands of Delta shares during the Class Period and owned 33,642 Delta shares toward the end of the Class Period.[3]

---

[3] See Delta's Proxy Statement, filed on May 17, 2011, at 11.

15.     Defendant Taylor because of his position with the Company, possessed the power and authority to control the contents of Delta's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions with the Company, and his access to material non-public information available to him but not to the public, Defendant knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Defendant is therefore liable for the false and misleading statements pleaded herein.

**Relevant Non-Parties**

16.     John R. Wallace ("Wallace") was, until July 7, 2010, Chief Operating Officer ("COO") and President of Delta.   During that time, Wallace also served as a director of Delta.   Wallace owned approximately 64,088 shares of Delta stock at the time of his resignation.

17.     Carl E. Lakey ("Lakey") was, from July 7, 2010 and throughout the remainder of the Class Period, Chief Executive Officer ("CEO") of Delta.   Prior to July 7, 2010, Lakey served as the Company's Senior Vice President of Operations.   At all relevant times, Lakey was a director of Delta.   During the Class Period, Lakey owned hundreds of thousands of Delta shares and owned 170,452 Delta shares toward the end of the Class Period.[4]

---

[4] See Delta's Proxy Statement, filed on May 17, 2011, at 11.

18.      Kevin K. Nanke ("Nanke") was, at all relevant times, Chief Financial Officer ("CFO") and Treasurer of Delta.   During the Class Period, Nanke owned hundreds of thousands of Delta shares and owned 168,280 Delta shares toward the end of the Class Period.[5]

## BACKGROUND

19.      Delta and its subsidiaries were engaged in the exploration, acquisition, development, production, and sale of natural gas and crude oil primarily in the Rocky Mountain and onshore Gulf Coast regions. The Company owned interests in developed and undeveloped oil and gas properties in federal units offshore California, near Santa Barbara, and developed and undeveloped oil and gas properties in the continental United States.   It also engaged in contract drilling operations, as well as providing moving services for third party drilling rigs in the Casper, Wyoming area.   Delta was founded in 1984 and is based in Denver, Colorado.

20.      Beginning in late 2008 and early 2009, Delta tried to monetize its assets through a variety of strategic alternatives to reduce its debt and improve liquidity. The Company hired an investment banker to consider joint venture opportunities, as well as equity and asset sales.   Ultimately, however, no potential buyers were receptive to entering into transactions with Delta.   According to Delta's bankruptcy filings, certain potential partners expressed concerns at that time as to whether Delta would be able to fulfill its financial commitments in a joint venture due to Delta's weak balance sheet.

21.      In late 2009 and continuing into the Class Period, Delta endeavored to streamline its business to focus on its core asset, the Vega Area of the Piceance Basin

---

[5]  See Delta's Proxy Statement, filed on May 17, 2011, at 11.

in western Colorado. The Company sought to divest many of its non-core assets and interests to reduce operating and overhead expenses, in order to be able to focus on the Vega Area and deploy its capital there. By year end 2010, *the Vega Area comprised approximately 84% of the Company's proved reserves and with its undeveloped leasehold potential comprised nearly all of the Company's long-term growth prospects*.

22.    On November 30, 2009, Delta issued a press release announcing that it would consider strategic alternatives to enhance shareholder value, including, but not limited to, exploring the sale of some or all of its assets, partnerships and joint venture opportunities, and the sale of the entire Company.

### PLAINTIFF'S INVESTIGATION REVEALS SIGNIFICANT PROBLEMS AT DELTA AND DEFENDANT'S KNOWLEDGE OF SUCH PROBLEMS

#### Information Gathered from Delta's Bankruptcy Filings

23.    In Delta's bankruptcy proceeding, the Company filed the Declaration of John T. Young, Jr.,[6] Chief Restructuring Officer of Delta Petroleum Corporation, In Support of First Day Relief ("Young Declaration" or "Young Decl.").[7]  This Declaration, which was filed on behalf of Delta, explains in detail how Delta's severe financial problems prior to and during the Class Period had lingering adverse effects on the Company's ability to continue as a going concern.

24.    According to the Young Declaration, the management that preceded Lakey led Delta to "pursue[] several business strategies that in hindsight have contributed to

---

[6] John T. Young, Jr. ("Young") now serves as CEO of Par Petroleum Corporation ("Par")—Delta's successor company.

[7] The Young Declaration is attached hereto as Exhibit A.

their decline." Young Decl. at ¶35. Young explains, in relevant part that under such management, "Delta ramped up drilling and exploration activities at a time when prices were falling and incurred substantial indebtedness to do so." *Id.* With the decline in business outlook came changes in management. *Id.* On May 27, 2009, Roger Parker, Delta's Chief Executive Officer and Chairman of the Board, resigned from the Company. *Id.* John Wallace continued in his role as President and functioned as the senior executive officer of Delta during the interim. *Id.* According to Young, "[t]he overall condition of Delta continued to decline under Wallace's leadership," (Wallace's leadership ended on July 6, 2010, when Carl Lakey was named Chief Executive Officer, to replace Wallace).[8] *Id* at ¶¶35-36. Young explained that additional efforts by Delta to market themselves for joint ventures and equity infusions were also attempted during Wallace's tenure, but failed. *Id.* at ¶35.

25.   In the years preceding the Class Period, Delta had established large amounts of debt that were scheduled to mature during the Class Period. Through several amendments and increases to a $200 million revolving and term loan facility for which JPMorgan Chase Bank, N.A. ("JPMorgan") served as the agent bank, (the "Secured Credit Facility"), Delta had increased its debt under the Secured Credit Facility to a high of $590 million in November 2008, when Delta entered into a Second Amended and Restated Credit Agreement with JPMorgan and other financial institutions. *See* Young Decl. at ¶23-24. According to Delta's Form 10-K for 2009, issued on March 11, 2010, the Secured Credit Facility was scheduled to mature in January 2011; however, prior to January 2011, Delta negotiated an extension of the maturity date to January 2012.

---

[8] Lakey had previously served as Senior Vice President of Operations for Delta and has been with Delta since 2007.

26.     Young's Declaration described that before the start of the Class Period, Delta's borrowing base had materially decreased and the Company's ability to borrow additional monies under the Secured Credit Facility became severely constricted as a result.   Young Decl. at ¶25.   Moreover, the Company's wells were not producing sufficient revenue.   According to Young, Delta ended 2010 with 190 wells producing natural gas and crude oil, yet "Delta decreased its drilling program from four rigs to one rig at year end 2008, and further to zero rigs in 2009 and 2010, primarily due to the decrease in natural gas prices."[9]   *Id.* at ¶18.   Thus, immediately prior to the start of the Class Period and continuing throughout the Class Period, Delta was experiencing ongoing liquidity concerns and increasingly difficult cash flow problems.   Consequently, as explained by Young, during the Class Period the Company had no alternative but to continually seek strategic alternatives—including, but not limited to, the sale of some or all of its assets, partnerships and joint venture opportunities, and the sale of the Company—only to find that potential buyers were unwilling to invest.   *See id.* at ¶¶39-44. To be sure, on December 1, 2009, Delta announced that it would consider strategic alternatives to enhance shareholder value, including, but not limited to, exploring the sale of some or all of its assets, partnerships and joint venture opportunities, and the sale of the entire company, including the Debtors or their assets.   Delta "retained a new set of investment bankers and undertook a second marketing process, but ultimately could not close a transaction with any potential buyer."   *Id.* at ¶40.

---

[9] As the Company scaled back its operations as further described below, Delta streamlined its businesses to focus on the Vega Area. According to Young, as of December 31, 2010, the Vega Area comprised approximately 84% of Delta's proved reserves and with its undeveloped leasehold potential comprises virtually all of their long-term growth prospects. Young Declaration at ¶19.

27.     According to the Young Declaration, Delta's liquidity problems "became more acute" in early 2010 because of Delta's inability to sell some or all of its assets. Delta's increased liquidity struggles caused Delta to default on certain debt covenants in March 2010, which "accelerated Delta's need for cash" and prompted a rushed sale of non-core properties to Wapiti Oil & Gas, LLC ("Wapiti").   Young Decl. at ¶41.   Indeed, Young stated, in relevant part:

> ***As a result of Delta's failure to close a transaction in late 2009 or early 2010, Delta's liquidity concerns became more acute, and [Delta] defaulted on certain covenants in March 2010 under the Secured Credit Facility*** and entered workout with the senior lenders. ***The default accelerated Delta's need for cash***, which could be done most quickly through a divesture of certain assets. Thanks in part to the strategic alternatives process, Delta was aware of several potential transactions, though most were toward the lower end of the anticipated value of the assets. However, due to the need to repay indebtedness, on July 30, 2010, [the Company] completed the $130.0 million sale of certain non-core properties to Wapiti Oil & Gas, L.L.C. ("Wapiti"). In conjunction with the completion of this transaction, the Debtors repaid $108.5 million of amounts borrowed under the MBL Credit Facility, and Delta's borrowing base under the credit facility was reduced to $35.0 million.

*Id.* (emphasis added).

28.     Indeed, Delta defaulted on certain covenants and obligations under the Secured Credit Facility and entered workout with the lenders in March 2010.   *Id.* at ¶41. "***Consequently, as senior lenders became fatigued with Delta's efforts, JPMorgan and the lenders under the Secured Credit Facility opted to assign all of their rights and obligations under the Secured Credit Facility to Macquarie Bank Limited ('MBL') on December 29, 2010***," whereby Delta entered into the Third Amended and Restated Credit Agreement with MBL ("MBL Credit Facility").   Young Decl. at ¶25. Proceeds from the July 2010 Wapiti transaction and the MBL Credit Facility were used to substantially reduce amounts outstanding under Delta's prior credit facility, as well as to

extend the maturity date thereunder from January 15, 2011 to January 31, 2012 and to fund capital expenditures.   *Id.* at ¶43.

29.   Still, Delta required additional cash infusions and sought further indebtedness.   On March 14, 2011, Delta and certain of its affiliates entered into an amendment to the agreement governing the MBL Credit Facility that increased the availability under the term loan at the time from $6.2 million to $25.0 million and did not require repayment of the term loan until the January 2012 maturity date. *Id.* at ¶42. "Specifically, among other changes, the amendment provided for an increase in the term loan commitment from $20.0 million to $25.0 million and removed the requirement that advances under the term loan be subject to approval of a development plan."   *Id.*

30.   During this time, Delta continued to consider various strategic alternatives. "The alternatives included, but were not limited to, reorganization, sale of separate operating units, sale of [Delta and its subsidiaries] as a whole, and liquidation."   *Id.* at 44. According to Young, Delta "began informally discussing with other oil and gas industry participants a new equity investment in spring 2011, but found that no one was interested in making such an investment given that [the Company and its subsidiaries] had substantial debt maturities looming less than a year away that would likely, in the opinion of such participants, cause such equity investments to be diluted, and that natural gas prices had continued to decline, decreasing the value of [the Company's] assets." *Id.* Thus, "[w]ith the need for cash still paramount, [Delta] entered into a second asset sale with Wapiti.   On June 28, 2011, [Delta] closed on a transaction with Wapiti to sell Delta's remaining interests in various non-core assets primarily located in Texas and Wyoming for gross cash proceeds of approximately $43.2 million."   *Id.* at ¶45.   Proceeds from this

transaction were used to further reduce amounts outstanding under the MBL Credit Agreement, as well as to fund capital expenditures.   "After the 2011 sale with Wapiti, the [Company] had divested of all of their material non-core assets."   *Id.*

31.     Young described the final months of the Class Period as follows:

The Debtors ultimately determined that an asset sale, either as one aggregate sale or as multiple sales, would yield the greatest return, in part because ***there did not appear to be an entity either willing to make an equity investment of a substantial enough size to allow the Debtors to fund ongoing drilling operations for the next few years, nor a realistic option to incur debt that would allow for existing indebtedness to be refinanced and provide enough liquidity to allow the Debtors to operate for more than nine months at most.***

In July 2011, the board of directors of Delta announced that it had engaged Macquarie Capital (USA) Inc. and Evercore Group, L.L.C. to act as advisors to Delta in conducting a strategic alternatives process in order to maximize shareholder value and address the 2012 debt maturities. In the strategic alternatives process, Delta's board of directors considered a wide variety of possible transactions, including the sale of the company, issuances of equity or debt securities, sales of assets, joint ventures and volumetric production payment financing, as well as other potential corporate transactions.

Specifically, to date, the Debtors' advisors sent initial marketing materials to approximately seventy-six (76) financial and strategic parties known to be interested in the oil and gas exploration and production sector in the Rockies, or who recently completed transactions involving oil and gas companies in the area. Twenty (20) of those entities signed confidentiality agreements and received offering memoranda, leading to due diligence and in-person data room presentations with eight (8) potential buyers. The Debtors, with the assistance of its attorneys and other representatives, have assembled data and documents to facilitate the diligence process and have prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Debtors' assets and businesses. ***Not a single prospective bidder expressed interest in consummating an out-of-court transaction with the Debtors that would allow the Debtors to receive enough debt to equity to fund ongoing drilling and exploration activities, and several noted the existence of unfavorable contracts with certain first purchasers that were economically unfavorable to Delta, that could best be dealt with through a bankruptcy filing.***

> Notwithstanding an extensive and thorough marketing process lasting several months, which culminated in several prospective offers, the Debtors ultimately concluded that they would achieve more value for their stakeholders by seeking chapter 11 protection and taking advantage of the powers available to debtors under the Bankruptcy Code. Specifically, the Debtors believe that they will be able to achieve more value for substantially all of their assets through chapter 11.

*Id.* at ¶¶46-48 (emphasis added).

32.     Ultimately on December 16, 2011, the Company filed bankruptcy proceedings under Chapter 11 of the Bankruptcy Code.   At the time of the bankruptcy Delta had no availability under the MBL Credit Facility, and the MBL Credit Facility was scheduled to mature on January 31, 2012.   Additionally, according to Young, the holders of the Senior Convertible Notes could (and would likely) require the Company to repurchase the notes at par value on or after May 1, 2012.[10] Even if Delta was able to find a lender willing to refinance the MBL Credit Facility and work out a restructuring of the Senior Convertible Notes, Young said, the 7% Notes are set to mature just three years later, and there is no clear path on how to repay the 7% Notes, which even in the most optimistic of circumstances would require a perfect business plan with flawless execution over the next three years, and with meaningful increases in the price of natural gas or in the Debtors' exploration activities.

**Information Obtained from Confidential Informants**

33.     <u>Confidential Informant 1 ("CI 1")</u> – CI 1 is the former Vice President of Corporate Development and Investor Relations at Delta from May 2005 until 2012.   CI 1 reported to Roger Parker, the former CEO of the Company, who left in May 2009, then to Wallace, the President and CEO, and then to Lakey who replaced Wallace as CEO.   CI

---

[10] On March 15, 2005, Delta Petroleum issued $150 million of 7% unsecured notes.

1 worked in the same office area as the Company executives on the 43rd floor of Delta's headquarters in Republic Plaza in Denver.

34.     CI 1 was responsible for budgeting and financial forecasting for Delta. Additionally, CI 1 helped prepare the Company's press releases and was the primary contact with shareholders, investors and bondholders.   While CI 1 reviewed the financial statements that were filed with the SEC, CI 1 explained that the CFO, Nanke, had the primary responsibility for financial filings with the SEC.

35.     CI 1 attended weekly or bi-weekly meetings with Delta's executive team, including the CEO, CFO, COO and general counsel.   When invited, CI 1 also attended meetings of Delta's Board of Directors.   For instance, CI 1 presented the annual budget to the Board at the end of each year.

36.     During the course of CI 1's tenure with Delta, CI 1 "tried to raise red flags" with regard to Delta's worsening financial position, especially as the Company's debt grew and it could not meet its debt obligations. CI 1 recalls urging Delta's CEO, CFO, COO and Board in 2009, twice in 2010 and again in 2011 to seek to raise capital through sales of equity in the Company.

37.     CI 1 recalled feeling concerned about the Company's liquidity and ability to pay its debts in 2009, 2010 and 2011.   CI 1 explained that, beginning in 2009 and continuing through the Class Period, the Company "had a liquidity issue.   We couldn't pay our bills."[11]   According to CI 1, many of the leases the Company purchased were on land with non-producing wells.

---

[11] Experts and courts have understood liquidity as "the ability or ease with which [a company can] timely meet its financial obligations and fund its operations with cash on hand, assets readily

38.     The possibility of bankruptcy became more real as the debt payments to the banks came due in the spring of 2009. "If we couldn't raise the money, bankruptcy was our only alternative," CI 1 said.   That was avoided by what CI 1 calls the "emergency equity offering" in May 2009. However that solution did not last long. By September or October of 2009, the liquidity problem became so severe that Delta's executives started discussing selling Delta and its assets to the highest bidder so it could pay its debts and other obligations.

39.     As CI 1 described it, Delta had to resort to selling off its non-core assets in Wyoming, Texas and Utah in 2010 and in Washington State in 2011 to raise capital. According to CI 1, 2009, 2010 and 2011 were "all about selling assets and paying debts."

40.     "We were trying to make lemonade out of onions.   Gas prices were in the toilet," CI said.

41.     CI 1 assisted in preparing Delta's March 2010 announcement of the tentative $400 million asset sale to Opon International ("Opon").   Sometime after the March 2010 announcement, CI 1 learned that Opon had backed away from the $400 million price and instead offered Delta a lower price for the assets.   CI 1 recalled that Defendant Taylor (Chairman of the Board) was "offended" by Opon's lower offer.

42.     CI 1 recalled that in May 2011, Delta's auditors told the Company's executives and Board members (including Defendant Taylor as well as Lakey and Nanke) that "bankruptcy is a real risk."

---

convertible to cash on hand, cash from operations, or readily accessible sources of debt." *See In re Vivendi Universal, S.A. Sec. Litig.,* 634 F.Supp.2d 352, 366 (S.D.N.Y. 2009).

43.     By June, July and August 2011, Delta was aggressively seeking investments and attempting to sell its assets. "Everything and anything was considered to de-leverage the Company," CI 1 said. The Board "wanted to sell the Company or its assets rather than fix the balance sheet. Any strategic alternative was being pursued – a sale of the Company, a sale of its assets or an investment for a percentage of the Company." However, Delta could not find any buyers.  "The main reason was gas prices," CI 1 said. "The profit margin was essentially zero.   Nobody was going to assume the risks -- not for the price we were asking."

44.     According to CI 1, the lack of bids provided Delta with a "smell test" of the Company's value by outside, disinterested parties.   CI 1 viewed the lack of any interest from bidders as meaning that Delta's assets were essentially worth $0.

45.     <u>Confidential Informant 2 ("CI 2")</u> – CI 2 served as an Accounts Payable Specialist at Delta from January 2005 through April 2011.   CI 2 reported to CI 5, Controller for the Company, who in turn reported to Nanke, Delta's CFO.   CI 2 was responsible for paying Delta's invoices received from the Company's many vendors.   CI 2 shared these responsibilities with a second accounts payable specialist, each covering half of the alphabet.   CI 2 worked on the 43rd floor of the Company's headquarters in Denver at 390 17th Street. The Company's executives, including Nanke and Lakey along with CI 5 (Controller) and CI 6 (VP and Corporate Controller), worked on the same floor.

46.     According to CI 2, Delta was experiencing severe cash flow problems in 2010 and 2011.   CI 2 said that around October or November 2010, CI 5 (Delta's Controller) directed CI 2 to stop sending out checks that had already been signed by Nanke to pay vendors. Instead, Nanke directed CI 2 to hold the checks for two to three

weeks.   Accordingly, rather than mailing the signed checks, CI 2 stored them in a locked drawer in the Accounts Payable Supervisor's office.   As a result, some vendors' checks were held for 45 to 60 days or longer.

47.     CI 2 estimated Delta held $500,000 to $1.2 million in payments each month from October or November 2010 and throughout CI 2's tenure at Delta (*i.e.*, until April 2011).

48.     CI 2 said Nanke would send CI 2 emails, ordering CI 2 to hold the largest checks for vendors that were for $25,000 to $50,000 to $100,000 or more.   CI 2 could not release the checks unless CI 5 gave explicit permission on a check-by-check basis for the largest vendors.   "He would say: 'release those, hold that,'" CI 2 said.

49.     "It got worse in the beginning of 2011," CI 2 said, noting the number of checks held for mailing grew larger in the spring of 2011. "We were holding the checks for quite some time."   The stack of checks on hold grew to approximately 25 to 30 at any given time.

50.     CI 2 explained that Nanke knew about the checks being held in the locked drawer and was responsible for placing the checks on hold.   "He's the one who was giving the okay to release the checks," CI 2 said of Nanke.

51.     According to CI 2, CI 5 would instruct CI 2 to release the checks in response to vendors' complaints after consulting with Nanke.   "When vendors called a lot, CI 5 would let Nanke know and then they would decide whether to release the check," CI 2 explained.   Among the checks that were held back were those for Baker Hughes and Halliburton, the largest vendors CI 2 could remember handling. Baker Hughes' checks

usually amounted to $100,000 each and Halliburton's checks were as much as $800,000 each. Both Baker Hughes and Halliburton would call for their payments.

52.    CI 2 recalled that beginning in August 2010 and continuing through March 2011, CI 2 began hearing rumblings inside the Company's executive offices that the Company was going to go bankrupt.    Additionally, CI 2 said that employees in the finance department began talking toward the end of 2010 and beginning of 2011 about the fact that Delta was making its numbers look better to investors than they actually were. "Whatever that meant I didn't know," CI 2 said.

53.    What CI 2 did know was that Delta "didn't have the money to pay their bills."

54.    According to CI 2, the Company's key accounting and finance executives knew about the severe financial problems during the Class Period.

55.    CI 2 recalled that around March 2011, some vendors, including Halliburton, insisted on being paid at least half their invoice in advance of doing any work for Delta.

56.    Confidential Informant 3 ("CI 3") – CI 3 is the President and CEO of Opon, a private oil and gas investment company based in Denver.    As announced in March 2010, Opon entered into a letter of intent to purchase certain assets from Delta's Vega area for a consideration price of $400 million.

57.    According to CI 3, Opon did a large amount of due diligence.    "We studied all the assets," CI 3 said, noting that Opon looked at Netherland Sewell reports and R.E. Davis reports.    During the course of Opon's due diligence, Opon determined that the assets to be purchased were not as valuable as initially thought.    CI 3 explained that the price of natural gas and the Nymex Strip's projection of gas prices did not support the $400 million valuation for these assets.    According to CI 3, Nymex projected natural gas

prices to go lower. Accordingly, CI 3 explained, Opon decided to terminate the asset purchase at the $400 million price. According to CI 3, the deal to purchase the assets for $400 million "*fell apart in the spring*."

58. CI 3 said that Opon instead made a lower offer to Delta for the purchase of the assets. "It was a much lower valuation because the price of natural gas had fallen so much, " CI 3 explained. Although CI 3 would not state the exact price of the second offer, CI 3 intimated, "We made an offer that was a much tougher deal than what we proposed originally."

59. CI 3 recalled that Opon offered the new purchase price to Delta's Board sometime in the spring of 2010.

60. CI 3 said that CI 3 dealt directly with Defendant Taylor, the Chairman of the Board, regarding Opon's retraction of the $400 million offer and regarding the extension of Opon's lower offer.

61. CI 3 explained that Delta's Board rejected Opon's lower offer. CI 3 said, "It was a much tougher deal. They [the Board] told us to take a hike."

62. CI 3 further explained that Delta's then CEO Wallace "was pushing the deal." According to CI 3's summation, "When it [the deal] didn't work, they [the Board] wanted someone different to lead the Company."

63. <u>Confidential Informant 4 ("CI 4")</u> – CI 4 worked as an Accounts Payable Supervisor at Delta from June 2008 until October 2010. CI 4 was responsible for the accounts payable department and had about five people who assisted with this, including CI 2.

64.     CI 4 explained that starting in March 2009 and continuing throughout CI 4's tenure, the Company's cash flow problem was so severe that Delta "had to pick and choose who we could pay."   CI 4 would send Nanke a list of the accounts payable, and Nanke would send back an okay beside those that Delta could afford to pay.   "Kevin Nanke always approved the payables, down to the check level," CI 4 said. "He actually gave me permission to send out the payment for each vendor."   "If some checks were held over the quarter by Kevin, I would figure out how much they were worth in total and reverse that number back into the cash account as a journal entry," CI 4 said.

65.     CI 4 explained that after Nanke signed checks to vendors, CI 4 kept them in CI 4's desk drawer until Nanke gave CI 4 approval to mail them out.   According to CI 4, after March 2009, Nanke always held back payments.   CI 4 explained that the practice of holding checks continued in and through 2010 and at no time ceased.

66.     ***CI 4 recalled Delta's cash flow problems gradually growing worse after March 2009***.   CI 4 noticed that the aging of the accounts payables were increasing from 30 days, to 45 days, to 60 days.   CI 4 maintained an aging report for accounts payables in an Excel spreadsheet that he would send to Nanke's assistant, Cheryl LaJeunesse, on a regular basis. "There were rumors that the aging accounts were being manipulated or modified by the treasury group" CI 4 said. "That's why Kevin wanted the report in an Excel spreadsheet."   Asked why the aging accounts would be manipulated, CI 4 was not sure but thought that it might have been done to make the company's financial condition more palatable to the banks from which Delta had borrowed money.

67.     Confidential Informant 5 ("CI 5") – CI 5 was a Controller at Delta from 2002 to 2012.   CI 5 reported to CI 6, another Controller, and to Nanke, the Company's CFO.

CI 5 was responsible for the day-to-day accounting functions at Delta, including overseeing the accounting for the Company's well drilling operations, accounts payable and accounts receivables.

68.     While CI 5 was not involved in the negotiations with Opon, CI 5 was aware of the Company's purported deal with Opon.   CI 5 recalled that Opon had an initial deal to buy certain assets from the Company for $400 million but that Opon later withdrew the $400 million offer.   CI 5 did not know why Opon withdrew its initial offer.

69.     CI 5 recalled that by spring of 2011, Delta's management was concerned about Delta's substantial debts.   "They were aware that the Company had bank debts and payments on bonds coming due [in 2012].   They were concerned."

70.     CI 5 explained that by spring 2011, Delta was aggressively seeking investments and was attempting to sell its assets.   "Delta needed to pay its debts. That was the point of the asset sales," CI 5 said.   In describing the Company's strategic alternative process, CI 5 described that Delta's management was "***talking about anything that would stick to the wall***."   (Emphasis added).

71.     CI 5 attributed Delta's difficulty in finding potential buyers for its assets to low natural gas prices and to the Company's troubled financial condition.   CI 5 said CI 6 provided the numbers to Lakey, the Company's President, who was responsible for the final impairment figures reported in Delta's filings with the SEC.

72.     Confidential Informant 6 ("CI 6") – CI 6 served as Vice President and Corporate Controller, and Controller of Financial Reporting, at Delta Petroleum from October 15, 2005 to January 31, 2012.   CI 6 reported to Nanke, the Company's CFO.

73.     CI 6 was responsible for rolling up the numbers for the Company's financial reports filed with the SEC.

74.     According to CI 6, Delta had frequent cash flow problems, stating "there were many points in time when the Company had cash flow problems." "This was a long slow demise that began in March 2009," when the banks tightened their credit agreement with Delta, CI 6 said.   CI 6 explained that "Delta was struggling from that 2009 period forward."

75.     CI 6 explained that the $420.1 million impairment in the third quarter of 2011 was the result of Delta's deteriorated financial condition, which under SEC rules prohibited the Company from reporting the reserves in proved, undeveloped locations, called "PUDS."   Under SEC rules, if a company does not have the finances to drill in proven, undeveloped locations, it can't report the reserves, CI 6 said.

76.     CI 6 explained that Delta's senior management—CEO, CFO, and Board—discussed the impairment issues and that the final determination of whether to keep the PUDs on the books would be made by Nanke and Lakey.

### DEFENDANT'S FALSE AND MISLEADING
### STATEMENTS ISSUED DURING THE CLASS PERIOD

77.     On March 18, 2010, Delta issued a press release announcing its preliminary agreement with Opon International, LLC ("Opon") to sell a 37.5% non-operating interest in the assets located in the Piceance Basin for consideration in the amount of $400 million. The press release stated in part:

> DENVER, Colorado (March 18, 2010) — Delta Petroleum Corporation (Delta) (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, announced it has entered into a non-binding letter of intent with Opon International LLC (Opon) to sell a 37.5% non-operated working interest in the Company's Vega Area assets

located in the Piceance Basin for total consideration of $400 million. It is expected that $225 million of the total consideration will be used by Delta for the development of the Vega Area over the next three years. Delta intends to use the remainder of the total consideration for its balance sheet obligations and general working capital purposes.

Delta has also agreed to issue to Opon at closing, warrants to purchase 13.3 million shares of Delta common stock at $1.50 per share and 5.7 million shares at $3.50 per share. Delta will provide further details of the transaction upon the execution by Delta and Opon of definitive agreements. The letter of intent is subject to customary due diligence, negotiation and execution of definitive binding agreements. This offer is contingent upon the buyer's ability to arrange financing. Delta has granted Opon a 60-day exclusive period to finalize the transaction, which is expected to close on or before June 1, 2010. Delta will retain operations of the Vega Area subject to a joint venture agreement with Opon.

78.    In response to this news, Delta stock rose to $19.50 per share, on heavy trading volume, before closing at $17.70 per share. [12]    The $17.70 closing price constituted a one-day increase of over 30% from the previous day's closing price.

79.    After close of trading on March 18, 2010, Bloomberg News published an article by Jim Polson discussing the day's atypical rally, entitled "Delta Petroleum Surges After Vega Sale Agreement."   The article stated the following, in relevant part:

March 18 (Bloomberg) -- Delta Petroleum Corp., the U.S. energy producer whose largest shareholder is Kirk Kerkorian, soared 30 percent, the most in six months, after agreeing to sell a stake in Colorado natural-gas fields for $400 million to revive drilling in the area.

Delta, based in Denver, rose 41 cents to $1.77 at 4 p.m. on the Nasdaq Stock Market, the largest one-day gain since Sept. 9. The shares have three "hold" ratings and three "sell" ratings from analysts.

Delta announced today a nonbinding agreement to sell closely held Opon International LLC a 37.5 percent interest in assets in the Vega area of the Piceance Basin, as well as 5.7 million new shares at $3.50 each and

---

[12] On July 13, 2011, Delta executed a 10-for-1 reverse stock split.   The stock prices and stock ownerships cited in this Complaint are adjusted for the stock split.

warrants to buy another 13.3 million shares at $1.50 each. Opon is also based in Denver.

Delta will continue to operate Vega and apply $225 million of the purchase price to develop it over the next three years. Lenders limited the company's drilling budget to $10 million in the current quarter and $5 million in the second quarter as gas prices fell, Delta said in a March 12 public filing.

The sales agreement is subject to financing and Opon has a 60-day exclusive period to complete the deal, Delta said. Kerkorian's Tracinda Corp. owned 34 percent of Delta as of Feb. 28, according to the filing.

Opon has developed a $500 million gas project in Colombia and has been a partner in exploration of that nation's Llanos Basin with Exxon Mobil Corp. and other oil companies, according to its Web site.

**Exploring Options**

Delta hired Morgan Stanley and Evercore Partners Inc. in November to explore a possible company sale or other options after its stock dropped 84 percent from a year earlier on tumbling gas prices.

Deutsche Bank Securities advised Opon, Delta said. Legal adviser to Delta was Davis Graham & Stubbs LLP. Hogan & Hartson LLP advised Opon.

Vega production fell 46 percent in a year to average 25.8 million cubic feet a day as of Dec. 31 as drilling stopped because of low prices and lack of cash, Delta said in the March 12 filing. The company said it has 2,000 potential well sites and that a nearby pipeline can handle 100 million cubic feet a day of output.

80.     On May 10, 2010, Delta issued a press release announcing its financial

results for the first quarter of 2010.   The press release stated in part:

DENVER, Colorado (May 10, 2010) – Delta Petroleum Corporation (Delta or the Company) (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, today announced its financial and operating results for the first quarter of 2010.

John Wallace, Delta's President and COO stated, "***The first quarter of this year was a noteworthy quarter for Delta. We continue to work with our potential partner, Opon International, in moving toward the signing of definitive agreements and closing of the transaction.*** We believe this relationship is certainly in the best interests of both our shareholders and our bondholders. The capital from this transaction would allow for an aggressive development of our main asset in the Piceance Basin, which provides substantial upside in proved reserves.

"In the Vega Area of the Piceance Basin we continued with moderate completion activity that was measured to preserve our current liquidity position. This completion activity involves new procedures and we've experienced very encouraging results to date."

**Letter of Intent (Strategic Alternatives) Update**

As previously announced on March 18, 2010, Delta entered into a non-binding letter of intent with Opon International LLC ("Opon") to sell a 37.5% non-operated working interest in the Vega Area assets located in the Piceance Basin for total consideration of $400 million and to issue Opon warrants to purchase 13.3 million shares of Delta common stock at $1.50 per share and 5.7 million shares at $3.50 per share. The consummation of the transaction is contingent upon Opon's ability to arrange financing and is subject to customary due diligence, negotiation and execution of definitive binding agreements. ***The parties are continuing with the proposed transaction and the Company understands that Opon's financing efforts are ongoing.***

(emphasis added).

81.     On May 10, 2010, the Company held a conference call with investors, analysts, and other market participants to discuss Delta's financial results for the first quarter 2010.   Defendant Taylor as well as Wallace and Nanke participated in the call. Defendant Taylor began the call by stating, in relevant part:

Good morning everyone. As we announced in March we have signed a letter of intent with Opon International to sell a 37.5% of working interest in our properties in the Vega area of the Piceance Basin along with warrants to purchase Delta Common stock for $400 million in total. ***We continue to work with Opon in their financing efforts and are working towards signing a definitive purchase and sale agreement.***

***We cannot comment specifically on the details of the proposed transaction but we are pleased that the process is going well and will provide you further updates as expeditiously and prudently as possible.*** We cannot comment further so we ask you to be mindful of this in your questions during the Q&A portion of the call.

82.     Defendant's foregoing statements were materially false and/or misleading when made.     Specifically, Defendant's statements were materially false and/or

misleading statements in that they failed to disclose that: (1) Delta's anticipated and much touted $400 million asset sale to Opon was terminated or at risk of termination and would not be completed for the initially announced price; (2) Opon was now balking at the $400 million asset purchase based on Opon's determination that Delta's Vega assets were worth substantially less; and (3) the Company's assets were severely impaired.   In reality, by this time Opon had backed away from the $400 million asset purchase based on its determination that the assets in question were not nearly as valuable as previously thought.   As explained by CW 3, the deal to purchase the assets for $400 million "fell apart in the spring."   Rather than disclosing the problems developing with the Opon deal, Defendant refused to speak about the transaction and left shareholders to believe that the deal was proceeding unimpeded, at the announced price of $400 million, misleadingly remarking, "we are pleased that the process is going well."

83.     The dissolved Opon deal was particularly problematic for Delta because the Company's default on certain debt covenants in March 2010 only "accelerated Delta's need for cash," requiring a fast sale of certain properties to pay down indebtedness.   As CI 1 described the situation, 2009, 2010 and 2011 were "all about selling assets and paying debts."   Moreover, according to CI 4, during the Class Period, Delta was only able to pay certain of the Company's vendors and were holding back signed checks until they could be released on an individual basis.   CI 1 and CI 6 also described significant cash flow problems at Delta that existed at this time.   These adverse financial circumstances made Defendant's materially false or misleading statements all the more deceptive to investors and increased the materiality of Defendant's omissions.

84.    On June 1, 2010, Delta issued a press release announcing an update on the anticipated transaction with Opon.   The press release stated in relevant part:

> DENVER, Colorado (June 1, 2010) — Delta Petroleum Corporation (Delta) (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, announced today an extension to the expected time frame to sign a definitive Purchase and Sale Agreement with Opon International LLC (Opon). ***Delta continues to work with Opon in its financing efforts and both parties are working towards signing a definitive Purchase and Sale Agreement.*** Delta does not intend to make further public comment with respect to the status of the transaction until such time as it believes disclosure is warranted and will not speculate as to the timing of any such communication.
>
> Delta's financial advisors on this transaction are Morgan Stanley and Evercore Partners. Opon's financial advisor is Deutsche Bank Securities Inc.
>
> As previously announced on March 18, 2010, Delta has entered into a non-binding letter of intent with Opon to sell a 37.5% non-operated working interest in its Vega Area assets located in the Piceance Basin for total consideration of $400 million. The letter of intent also contemplates that Delta would issue to Opon, at closing, warrants to purchase 13.3 million shares of Delta common stock at $1.50 per share and 5.7 million shares at $3.50 per share. Delta will provide further details of the transaction upon the execution by Delta and Opon of definitive agreements. The letter of intent is subject to customary due diligence, negotiation and execution of definitive binding agreements as well as Opon's ability to arrange financing.

(emphasis added).

85.    Defendant's statements in the above press release were materially false and/or misleading when made.   Specifically, Defendant materially misrepresented the facts with regard to the Opon deal.   Because the initial agreement with Opon and Delta intended that the purchase be finalized by June 1, 2010, Delta's officers and directors, in particular Defendant Taylor who had previously discussed the Opon deal, were pressured to issue an explanation as to why the transaction had not been completed.   Rather than disclosing the actual facts, however, Defendant simply announced that Opon needed additional time to secure financing.   In actuality, according to CI 3 (Opon's CEO), Opon

had already, in the Spring of 2010, retracted the $400 million offer and had instead presented a new, lower offer to the Board, in CI 3's words, "a much tougher deal."

86.    On July 7, 2010, Delta issued a press release announcing the appointment of Lakey as CEO and the "agreed to" resignation of Wallace.   The Company also announced the termination of the joint venture transaction with Opon.   The press release stated in part:

> DENVER, Colorado (July 7, 2010) — Delta Petroleum Corporation (Delta) (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, today announced that Carl Lakey has been named Chief Executive Officer, effective immediately. Mr. Lakey most recently served as Senior Vice President of Operations for Delta and has been with the Company since 2007.
>
> Mr. Lakey has spent his entire professional career in oil and gas exploration and production. Prior to joining Delta Petroleum, Mr. Lakey spent six years managing operations at El Paso Production Company and sixteen years in various operational and technical positions at ExxonMobil.
>
> "Carl is a veteran oil and gas production and development executive and has been instrumental in increasing net production and proved reserves during his time at Delta Petroleum," said Daniel Taylor, Chairman of the Board of Delta Petroleum. "He's a skilled operator and knows this business extremely well. We believe he is the right person to take Delta Petroleum forward, particularly our principal assets in the Piceance Basin."
>
> Delta also announced today that John R. Wallace, currently President and COO, agreed to resign from the Company as an officer and director to pursue other interests. "John has been an extremely valuable member of our leadership team, integral in identifying and developing our most valuable asset, the Vega field. We thank him for his service, and wish him the best in his future endeavors," said Mr. Taylor.
>
> ***In addition, Delta announced that it has terminated discussions to sign a definitive Purchase and Sale Agreement with Opon International LLC to sell a 37.5% non-operated working interest in, and jointly develop, its Vega Area assets in the Piceance Basin. Delta terminated the discussions after Opon was unable to obtain financing for the transaction on the agreed-upon terms.*** Delta will continue to pursue disciplined development of its main asset in the Piceance Basin to bolster proved reserves. In the Vega Area, Delta is taking a balanced approach to employing new procedures that are improving completion results while

preserving liquidity. Delta is also continuing to pursue strategic alternatives to enhance shareholder value. ***Mr. Taylor continued, "While Opon was unable to arrange financing for a transaction on terms acceptable to us, we remain confident in the value of our Vega Area asset, and intend to further delineate that value as we consider the Company's other strategic alternatives***."

(emphasis added).

87.    Defendant's statements in the above press release were materially false and/or misleading when made.    Defendant attributed the termination of the Opon deal to Opon's lack of financing when the actual facts were that Opon determined the assets to be worth far less than $400 million.    As explained by CI 3, the deal was terminated not because of Opon's lack of financing but because Opon determined, after due diligence, that the 37.5% interest in the Vega Area assets was not worth $400 million.    According to CI 3, Opon, after performing due diligence, determined that the assets were not worth $400 million.    Opon thereby retracted the $400 million offer and instead presented Delta's Board with a much lower offer in the spring of 2010.    CI 1 (Delta's former VP of Corporate Development and Investor Relations) corroborates CI 3's testimony.    CI 1 explained that after the March 2010 announcement, CI 1 learned that Opon had backed away from the $400 million price and instead offered Delta a lower price for the assets. CI 1 recalled that Defendant Taylor (Chairman of the Board) was "offended" by Opon's lower offer.    Similarly, CI 5 recalled that Delta announced a deal with Opon to buy certain assets from the Company for $400 million, but CI 5 recalled that Opon later withdrew the $400 million offer.

88.    Quite notably, Defendant never disclosed that following due diligence Opon had withdrawn its $400 million offer, nor did Defendant disclose that Opon made a new, lower, "much tougher," offer which implied a considerably lower value to the Vega Area

asset. To the exact contrary, Defendant instead reaffirmed the value of the Company's Vega Area assets. Thus, investors were left with the impression that a 37.5% interest in the Vega Area assets at issue was worth $400 million even to third parties. Defendant's statements additionally suggested that other potential bidders would find the assets to be worth $400 million. Thus, Taylor's statement in the last sentence of the above block quote was materially misleading.

89. This material misstatement and/or omission concealed the risk that the Vega Area assets were worth far less than Defendant had led investors to believe and that the Company would not be able to refinance its debt obligations.

## DEFENDANT AND DELTA CONTINUE TO MISLEAD INVESTORS

90. On July 23, 2010, Delta issued a press release announcing a purchase and sale agreement with Wapiti in which the Company agreed to sell certain non-core assets for $130 million in consideration. The press release stated in pertinent part:

> DENVER, Colorado (July 26, 2010) — Delta Petroleum Corporation (Delta) (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, announced today that it has entered into a Purchase and Sale Agreement (PSA) with Wapiti Oil & Gas, L.L.C. (Wapiti) to sell various non-core assets for $130 million. The parties expect to consummate the transaction in August.

> The non-core assets to be sold to Wapiti include all of Delta's 31% working interest in the Garden Gulch field of the Piceance Basin in Colorado, all of its working interest in the Baffin Bay field of Texas, all of its interest in Piper Petroleum, half of its working interest in its DJ Basin fields, as well as half of its working interest in the following fields in Texas: Caballos Creek, Choke Canyon, Midway Loop, Newton, and Norian. Delta also will sell to Wapiti its working interest in its acreage positions in the DJ Basin of Wyoming, Colorado and Nebraska; and other acreage in South Texas. Along with the sale of the working interests, Delta has agreed to allow Wapiti to operate the Newton and Midway Loop fields, as well as the other fields of Texas of which it was the operator.

> Carl Lakey, Delta's CEO commented, "This asset sale is an important step for Delta and allows us to continue to reduce our overall leverage and

meaningfully strengthen our liquidity position. We will be selling Wapiti our interest in assets that we increasingly considered non-core as we continue to focus on our main asset, the Vega Area, of the Piceance Basin. We believe the assets to be sold in this transaction are not adequately valued by the market as part of Delta, making this sale of non-core assets all the more attractive. The immediate use of proceeds will be to pay down the outstanding balance on our senior credit facility."

91.   On August 9, 2010, Delta issued a press release announcing financial results for its second quarter ended June 30, 2010.   In the August 9, 2010 press release, the Company also reported proved properties (reserves) in the amount of $944.2 million and unproved properties in the amount of $236 million, less depletion.   The press release stated in relevant part:

DENVER, Colorado (August 9, 2010) – Delta Petroleum Corporation (the "Company" or "Delta") (NASDAQ Global Market: DPTR), an independent oil and gas exploration and development company, today announced its financial and operating results for the second quarter of 2010.

Carl Lakey, Delta's President and CEO, stated, "The second quarter for 2010 was a pivotal period for Delta Petroleum. We have now completed our strategic alternatives process and have begun analyzing the results from earlier changes in the well completion process in the Piceance Basin. The new completion technique is generating results that are better than expected. Although we are still early in the evaluation process, the results to date do suggest using the new technique on all 15 remaining wells."

"After the end of the quarter, we received approximately $130 million in gross proceeds from the sale to Wapiti Oil & Gas of certain non-core properties that amounted to approximately 25% of our total proved reserves at year end 2009. With the proceeds from this transaction, we have reduced our credit facility borrowings to very minimal levels and we are now in the process of obtaining a new credit facility that we expect to have in place by the end of the third quarter. We will continue to stringently focus on cost control and efficient operations in the Vega area and are confident that we will be able to create value in doing so."

### $130 Million Asset Divestiture

As previously announced, the Company closed on its $130 million non-core asset sale with Wapiti Oil & Gas, L.L.C. ("Wapiti") on July 30, 2010 (the "Wapiti Transaction"). Of the $130 million purchase price, $112 million was received by the Company at closing and used to reduce bank debt and to

pay transaction costs. The remaining $18 million is being held in escrow until third party consents are obtained for the assignment of the Company's working interest in certain properties that were a part of the transaction. The Company expects to receive the consents and escrowed funds during the third quarter of 2010, and upon receipt, such funds will also be used to reduce debt.

In accordance with applicable accounting standards, properties held for sale at June 30, 2010 in conjunction with the Wapiti Transaction in which the Company only sold half of its interest continue to be reported as a component of continuing operations and are primarily comprised of the Newton and Midway Loop fields. The fields classified as discontinued operations are fields in which the Company sold all of its interest and include the 31% working interest in the Garden Gulch field, the Baffin Bay field, and the Bull Canyon field, as well as the Company's interest in its wholly-owned subsidiary, Piper Petroleum.

The Company recorded impairment losses associated with assets held for sale during the three months ended June 30, 2010 of $96.1 million, of which $92.2 million was included in loss from discontinued operations and $3.9 million was included in dry holes and impairments. The Company expects to recognize a gain on sale for the closing of the Wapiti Transaction in the three months ending September 30, 2010 of approximately $29.4 million, subject to revision for normal and customary purchase price adjustments as provided for under the purchase and sale agreement. In total, the Wapiti Transaction is expected to result in a $66.7 million loss when the second quarter asset held for sale impairments are considered in conjunction with the third quarter gain on sale.

*See* Reconciliation of Non-GAAP Measures below for a reconciliation of non-GAAP measures to the GAAP measures each as provided herein.

92.    On August 9, 2010, the Company also filed with the SEC its Form 10-Q for the second quarter ended June 30, 2010, which reiterated its financial results announced in the earnings release.

93.    With respect to its oil and gas properties the Company reported the following:

**Impairment of Long-Lived Assets**

Long-lived assets are reviewed for impairment at least annually, or more frequently when events or changes in circumstances indicate that the carrying value of such assets may not be recoverable.

33

Estimates of expected future cash flows represent management's best estimate based on reasonable and supportable assumptions and projections. For proved properties, if the expected future cash flows exceed the carrying value of the asset, no impairment is recognized. If the carrying value of the asset exceeds the expected future cash flows, an impairment exists and is measured by the excess of the carrying value over the estimated fair value of the asset. Any impairment provisions recognized are permanent and may not be restored in the future.

The Company assesses proved properties on an individual field basis for impairment on at least an annual basis. For proved properties, the review consists of a comparison of the carrying value of the asset with the asset's expected future undiscounted cash flows without interest costs. ***For the three and six months ended June 30, 2010, the expected future undiscounted cash flows of the assets exceeded the carrying value of the corresponding asset and as such no impairment provision was recognized.*** As a result of such assessment, the Company recorded an impairment provision to proved properties of $265,000 for the three months ended June 30, 2009 and $1.2 million for the six months ended June 30, 2009. The impairment provisions for the three and six months ended June 30, 2009 are included within dry hole costs and impairments in the accompanying statement of operations.

For unproved properties, the need for an impairment charge is based on the Company's plans for future development and other activities impacting the life of the property and the ability of the Company to recover its investment. When the Company believes the costs of the unproved property are no longer recoverable, an impairment charge is recorded based on the estimated fair value of the property. As a result of such assessment, the Company recorded impairment provisions attributable to unproved properties of $21.6 million and $82.9 million for the three months ended June 30, 2010 and 2009, respectively, and $22.5 million and $83.1 million for the six months ended June 30, 2010 and 2009, respectively. The $22.5 million impairment for the six months ended June 30, 2010 included $11.4 million related to the Company's Columbia River Basin leasehold, $5.0 million related to the Company's Hingeline leasehold, $3.8 million related to the Company's Haynesville leasehold, $1.6 million related to the Company's Delores River leasehold and $661,000 related to the Company's Howard Ranch leasehold. For the three months ended June 30, 2009, the Company recorded an impairment of $10.5 million to reduce the Company's Vega area land carrying value to its estimated fair value. Lastly, the Company recorded impairments of $4.8 million and $1.9 million to reduce the Paradox pipeline carrying value to its estimated fair value during the three months ended June 30, 2010 and 2009, respectively. These impairment provisions are included within dry hole costs and impairments in the accompanying statements of operations for the three and six months ended June 30, 2010 and 2009.

During the remainder of 2010, the Company plans to develop and evaluate certain proved and unproved properties. Favorable or unfavorable drilling results or changes in commodity prices may cause a revision to estimates of those properties' future cash flows. Such revisions of estimates could require the Company to record additional impairment provisions in the period of such revisions.

(emphasis added).

94.     That same day, August 9, 2010, the Company held a conference call with investors, analysts, and other market participants to discuss Delta's financial results for the second quarter 2010.   During the conference call, Defendant Taylor, in relevant part, stated:

As we announced last week, we have closed on the sale of non-core assets for cash consideration of $130 million to Wapiti Oil and Gas. We received approximately $112 million of the proceeds on July 30. The remaining $18 million is held in escrow, pending required consents, which we have no reason to believe, will not be received.

* * *

The asset sale was the result of a competitive process and part of the strategic alternative process previously announced and discussed. This process has now been concluded and the company will focus on creating value with its core assets through operations. The Board of Directors will, of course, re-evaluate the renewal of this process at a later date.

* * *

At the closing of the asset sale, the efforts of Management are now directed to refinancing our senior credit facility, which matures in January. As stated in our press release, our revolving credit facility borrowing base was re-determined downward to $35 million after the asset sale. ***It should be understood that our asset base supports a conforming borrowing base much larger than $35 million, but given the short duration until the maturity of the facility, we agreed that a lower number was acceptable.***

Kevin will discuss the status of our refinancing efforts in his comments. As was announced last month, the Board of Directors named Carl Lakey Delta's Chief Executive Officer. Carl was the clear and unanimous choice given his experience and the Board's desire to refocus Delta's efforts towards its operation.

Carl is proven to be a very capable manager and leader not only during his tenure here at Delta, but also previously in his career when he managed operations and budgets much larger than those at Delta. We have full confidence in his ability to direct this company in a way that creates value from our asset base.

(emphasis added).

95.     By this point, it is evident that Delta's Vega Area assets were impaired. Delta was deeply in debt and did not have the liquidity to develop the properties. Delta was experiencing significant cash flow difficulties, as described by multiple CIs. According to CI 4, at the time of these statements, Delta was unable to pay its vendors and had a practice of holding back signed checks until they could be released on an individual basis.   CI 1 and CI 6 also attested to significant liquidity issues at Delta during this time.   As CI 1 succinctly stated: "We couldn't pay our bills."   In fact, the Company's default on certain debt covenants in March 2010 only "accelerated Delta's need for cash," making the asset sale to Wapiti necessary just to pay down indebtedness and to maintain ongoing operations.   As CI 1 described the situation, 2009, 2010 and 2011 were "all about selling assets and paying debts."   Not only was Delta experiencing severe shortages in capital, but Opon had terminated the $400 million asset purchase based on its substantially lower valuation of the assets.

96.     On November 9, 2010, Delta issued a press release announcing financial results for its third quarter 2010.   In the November 9, 2010 press release, the Company also reported proved reserves in the amount of $944.2 million and unproved properties in the amount of $235 million, less depletion. The Company reported net income of $13.9 million, or $0.05 diluted EPS.

97.     On November 9, 2010, the Company filed with the SEC its Form 10-Q for the third quarter ended September 30, 2010, which reiterated its financial results announced in the earnings release.

98.     With respect to impairment of its oil and gas properties the Company stated the following:

**Impairment of Long-Lived Assets**

Long-lived assets are reviewed for impairment at least annually, or more frequently when events or changes in circumstances indicate that the carrying value of such assets may not be recoverable.

Estimates of expected future cash flows represent management's best estimate based on reasonable and supportable assumptions and projections. For proved properties, if the expected future cash flows exceed the carrying value of the asset, no impairment is recognized. If the carrying value of the asset exceeds the expected future cash flows, an impairment exists and is measured by the excess of the carrying value over the estimated fair value of the asset. Any impairment provisions recognized are permanent and may not be restored in the future.

The Company assesses proved properties on an individual field basis for impairment on at least an annual basis. For proved properties, the review consists of a comparison of the carrying value of the asset with the asset's expected future undiscounted cash flows without interest costs. *For the three and nine months ended September 30, 2010, the expected future undiscounted cash flows of the assets exceeded the carrying value of the corresponding asset and as such no impairment provision was recognized.* As a result of such assessment, the Company recorded an impairment provision to proved properties of $1.9 million for the three months ended September 30, 2009 and $3.1 million for the nine months ended September 30, 2009. The impairment provisions for the three and nine months ended September 30, 2009 are included within dry hole costs and impairments in the accompanying statement of operations.

For unproved properties, the need for an impairment charge is based on the Company's plans for future development and other activities impacting the life of the property and the ability of the Company to recover its investment. When the Company believes the costs of the unproved property are no longer recoverable, an impairment charge is recorded based on the estimated fair value of the property. ***As a result of such assessment, the Company recorded impairment provisions attributable to unproved properties of zero and $20.6 million for the three months ended***

**September 30, 2010 and 2009, respectively,** and $22.5 million and $103.6 million for the nine months ended September 30, 2010 and 2009, respectively. The $22.5 million impairment for the nine months ended September 30, 2010 included $11.4 million related to the Company's Columbia River Basin leasehold, $5.0 million related to the Company's Hingeline leasehold, $3.8 million related to the Company's Haynesville leasehold, $1.6 million related to the Company's Delores River leasehold and $661,000 related to the Company's Howard Ranch leasehold. For the three months ended September 30, 2009, the Company also recorded an impairment of $10.5 million to reduce the Company's Vega area land carrying value to its estimated fair value. Lastly, the Company recorded impairments of $4.8 million and $1.9 million to reduce the Paradox pipeline carrying value to its estimated fair value during the three months ended June 30, 2010 and 2009, respectively. These impairment provisions are included within dry hole costs and impairments in the accompanying statements of operations for the three and nine months ended September 30, 2010 and 2009.

During the remainder of 2010, the Company plans to develop and evaluate certain proved and unproved properties. Favorable or unfavorable drilling results or changes in commodity prices may cause a revision to estimates of those properties' future cash flows. Such revisions of estimates could require the Company to record additional impairment provisions in the period of such revisions.

(emphasis added).

99.     By this point, it is evident that Delta's Vega Area assets were impaired. Delta was deeply in debt and did not have the liquidity to develop the properties. Delta was experiencing significant liquidity problems, as described by multiple CIs.   According to CI 2 and CI 4, at the time of these statements, Delta was unable to pay its vendors and had a practice of holding back signed checks until they could be released on an individual basis.   CI 1 and CI 6 also attested to significant liquidity issues at Delta during this time. "We couldn't pay our bills," CI 1 noted.   Delta's default on certain debt covenants in March 2010 "accelerated Delta's need for cash," making the asset sale to Wapiti necessary just to pay down indebtedness and to maintain ongoing operations.   As CI 1 described the situation, 2009, 2010 and 2011 were "all about selling assets and paying

debts." Not only was Delta experiencing severe shortages in capital, but Opon had terminated the $400 million asset purchase based on its substantially lower valuation of the assets. Moreover, by this time CI 2 recalled hearing talk in Delta's executive offices that Delta was going bankrupt and further recalled rumors that Delta was making its numbers look better to investors than they actually were.

100. On March 16, 2011, Delta issued a press release announcing its financial results for its fourth quarter and full year ended December 31, 2010. The release stated in part:

> Carl Lakey, Delta's President and CEO stated, "We are very pleased with our results for the fourth quarter. Our EBITDAX is 20% higher than the third quarter driven by lower operating and overhead costs, despite lower production related to asset sales and lower average Henry Hub gas prices in the quarter. We have been committed to reducing our operating and overhead costs, and I'm pleased to state that we have been able to deliver such results. We drove our LOE/Mcfe down by 38% compared to the third quarter. Additionally, our overhead costs are down 25% from the third quarter. We remain focused on sustaining costs at or near these levels for 2011. We've also had very positive results from the well completion activity performed in the fourth quarter and to date in the first quarter of this year. The larger frac design, which we call Gen IV, has increased our initial production and our estimated reserves per well. We have completed a total of 16 wells with the Gen IV frac design and all have performed better than we would have expected under prior completion designs. Thus, we expect first quarter production to increase 4% to 7% over the fourth quarter. ***These new cost control measures substantially improve our EBITDAX and cash flow which, combined with increased production at the Vega Area, provide value to our shareholders.***"

(emphasis added).

101. The same day, March 16, 2011, the Company filed with the SEC its Form 10-K for the year ended December 31, 2010, which reiterated its financial results announced in the earnings release. The Form 10-K was signed by Defendant Taylor and by Lakey and Nanke. With respect to impairment of oil and gas properties the Company reported the following:

**Impairment of Long-Lived Assets**

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying value of such assets may not be recoverable.

Estimates of expected future cash flows represent management's best estimate based on reasonable and supportable assumptions and projections. For proved properties, if the expected future cash flows exceed the carrying value of the asset, no impairment is recognized. If the carrying value of the asset exceeds the expected future cash flows, an impairment exists and is measured by the excess of the carrying value over the estimated fair value of the asset. Any impairment provisions recognized are permanent and may not be restored in the future.

The Company assesses proved properties on an individual field basis for impairment on at least an annual basis. ***During the year ended December 31, 2010, the Company recorded an impairment provision related to continuing operations attributable to proved properties of $1.1 million for the year ended December 31, 2010, which are included within dry hole costs and impairments in the accompanying statement of operations.***

\* \* \*

For unproved properties, the need for an impairment is based on the Company's plans for future development and other activities impacting the life of the property and the ability of the Company to recover its investment. When the Company believes the costs of the unproved property are no longer recoverable, an impairment charge is recorded based on the estimated fair value of the property.

As a result of such assessment, the Company recorded impairment provisions attributable to unproved properties of $42.4 million for the year ended December 31, 2010 which primarily included $13.2 million related to the Company's Columbia River Basin leasehold, $6.2 million related to the Company's Hingeline leasehold, $3.8 million related to the Company's Haynesville leasehold, $4.0 million related to the Company's Delores River leasehold, $1.6 million related to the Company's non-operated Garden Gulch leasehold, and $661,000 related to the Company's Howard Ranch leasehold. The Company also recorded impairments of $6.7 million related to the produced water handling facility in Vega, and $4.9 million to reduce the Paradox pipeline carrying value to its estimated fair value. These impairment provisions are included within dry hole costs and impairments in the accompanying statements of operations for the year ended December 31, 2010. These impairments generally resulted from the lack of success in

marketing these non-core assets combined with our lack of plans to develop the acreage.

* * *

For 2011, the Company plans to develop and evaluate certain proved and unproved properties. Favorable or unfavorable drilling results or changes in commodity prices may cause a revision to estimates of those properties' future cash flows. Such revisions of estimates could require the Company to record additional impairments in the period of such revisions.

(emphasis added).

102.    The next day, on March 17, 2011, the Company held a conference call with investors, analysts, and other market participants to discuss Delta's financial results for the fourth quarter and year-end 2011.   During the conference call, Defendant Taylor, in relevant part, stated:

Contemporaneous with the appointment of Carl as our CEO in the summer of last year, the Board outlined several objectives to be achieved for the remainder of 2010. We communicated this to you in our prior conference calls. They were the simplification of our asset base through the sale of non-core assets, the reduction of operating and overhead cost, the improvement of Vega Area's per well reserves and economics and the obtaining of a new senior secured credit facility.

***We achieved all of these objectives, and Carl and Kevin will take you through each of them. These accomplishments are noteworthy and of great value to Delta, particularly in the current gas price environment. Going into 2011, these operational improvements will have a very positive effect on Delta's direction, strategy and asset value.*** For this year, our objectives are to maintain the cost improvements we achieved in the fourth quarter, to quantify any additional reserve upside in the deeper zones of the Vega Area, to solidify our acreage position in the Vega Area, to maintain an operational focus on our core asset and to reduce our financial leverage and improve liquidity. The execution of these objectives will ensure that we realize our ultimate goal of continuing to improve our asset value in the current commodity price environment and creating value for our shareholders.

I'm sure many of you have heard or read the response of noteworthy CEOs of other E&P companies that have expressed their research, reviews and forecast of the North American natural gas market. ***While we generally share these predictions of the recovery of natural gas prices, we view***

*it is our responsibility to help Delta prosper in the current natural gas market environment and not to simply survive until the recovery occurs. We have taken some meaningful concrete steps in that direction and will continue to do so in 2011.*

Carl and the rest of the management team have shown the Board that they are fully capable of achieving the strategic objectives for 2011. The management team and the company have the full support and backing of its largest shareholder, Tracinda Corporation. We are anticipating a promising year in 2011.

(emphasis added).

103.   At this time, Delta was experiencing significant financial problems. According to CI 2, the Accounts Payable Specialist, Delta was experiencing severe cash flow problems in 2010 and 2011, and was selectively paying vendors.   CI 2 said that around October or November 2010, CI 5 (Delta's Controller) directed CI 2 to stop sending out checks that had already been signed by Nanke to pay vendors. Instead, Nanke directed CI 2 to hold the checks in a locked drawer in the Accounts Payable Supervisor's office.   As a result, some vendors' checks were held for 45 to 60 days or longer, CI 2 said.

104.   CI 2 estimated Delta held $500,000 to $1.2 million in payments each month from October or November 2010 and throughout CI 2's tenure at Delta (*i.e.*, until April 2011).   CI 2 explained that Nanke would send CI 2 emails, ordering CI 2 to hold the largest checks for vendors that were for $25,000 to $50,000 to $100,000 or more.   CI 2 could not release the checks unless CI 5 gave explicit permission on a check-by-check basis for the largest vendors.   "He would say: 'release those, hold that,'" CI 2 said. Among the checks that were held back were those for Baker Hughes and Halliburton, the largest vendors CI 2 could remember handling. Baker Hughes' checks usually amounted to $100,000 each and Halliburton's checks were as much as $800,000 each. Both Baker

Hughes and Halliburton would call for their payments.   CI 4 corroborated CI 2's descriptions of held checks.   According to CI 4, CI 4 would send Nanke a list of the accounts payable, and Nanke would send back an okay beside those that Delta could afford to pay.   "Kevin Nanke always approved the payables, down to the check level," CI 4 said. "He actually gave me permission to send out the payment for each vendor."   CI 4 further explained that after Nanke signed checks to vendors, CI 4 kept them in CI 4's desk drawer until Nanke gave CI 4 approval to mail them out.

105.   ***"It got worse in the beginning of 2011***," CI 2 recalled, noting the number of checks held for mailing grew larger in the spring of 2011. "We were holding the checks for quite some time."   The stack of checks on hold grew to approximately 25 to 30 at any given time.   Additionally, CI 2 recalled feeling that by early 2011 Delta's executives "were presenting a better picture to investors than reality."   CI 1 and CI 6 also attested to significant liquidity issues at Delta during this time.   "We couldn't pay our bills," CI 1 recalled.

106.   Delta's own bankruptcy statements show that in early 2011 Delta required additional cash infusions and sought further indebtedness.   "On March 14, 2011, Delta and certain of its affiliates entered into an amendment to the agreement governing the MBL Credit Facility that increased the availability under the term loan at the time from $6.2 million to $25.0 million and did not require repayment of the term loan until the January 2012 maturity date."   Young Decl. at ¶42.

107.   Indeed, by spring 2011, Delta was aggressively seeking investments and was attempting to sell its assets. "Delta needed to pay its debts. That was the point of the

asset sales," CI 5 said. In describing the strategic alternative process, CI 5 said that Delta's management was "***talking about anything that would stick to the wall***."

108.   As Defendant knew or should have known in the absence of recklessness, Delta's Vega Area assets were impaired.   Delta was deeply in debt and did not have the liquidity to develop the properties. Not only was Delta experiencing severe shortages in capital, but Opon had terminated the $400 million asset purchase based on its substantially lower valuation of the assets.   Moreover, by this time CI 2 recalled hearing talk in Delta's executive offices that Delta was going bankrupt and further recalled rumors that Delta was making its numbers look better to investors than they actually were.

109.   On May 10, 2011, Delta announced its first quarter 2011 financial results. The Company reported proved reserves in the amount of $878.2 million and unproved properties in the amount of $230.1 million, less depletion. The release stated in part:

> Carl Lakey, Delta's CEO and President stated, "***We are pleased to have posted another solid financial quarter driven by increased production from our core asset and a continued focus on cost control.***   The current pricing environment bolstered by strength in natural gas liquids and condensate further enhances the financial performance of the asset.   Our EBITDAX for the first quarter was 30% higher than the first quarter 2010 when adjusted for discontinued operations.   In addition to our financial results from the first quarter, we continue to be excited about the shale resource potential in the Vega Area.   The completion information gathered from the 2C well and additional confirmation results from the 2B well justify additional capital deployment targeting the deeper shales and further validate our strategy to focus our resources on our core area."

> * * *

> "While production was up 4% over the fourth quarter, it was slightly beneath our expectations due to timing decisions on our inventory wells as a result of shale well activity. We have maintained our cost control discipline as was demonstrated in the fourth quarter.   We continue to build on the momentum of improved financial performance from our Piceance asset and will continue to deploy our available capital to our core asset.   As part of this strategy, we will be marketing for sale our non-operated properties in Texas and the DJ Basin.   If the sale is completed, we plan to use the net proceeds

for additional drilling activity in the Vega Area targeting the deeper shale formations and repayment of a portion of the outstanding balance on our senior secured credit facility."

(emphasis added).

110. On May 10, 2011, the Company filed with the SEC its Form 10-Q for the first quarter ended March 31, 2011, which reiterated its financial results announced in the earnings release.

111. Additionally, the Company reported no "significant" oil and gas properties impairment charges.

112. The next day, on May 11, 2011, the Company held a conference call with investors, analysts, and other market participants to discuss Delta's financial results for the first quarter 2011. Defendant Taylor, along with Lakey and Nanke, participated in the call. During the conference call, Defendant Taylor, in relevant part, stated:

> In a recent report published last week, an analyst stated that the wells drilled by a nearby competitor rival Haynesville wells and provide indications that continued development of the Niobrara may dramatically change the economics of Piceance development. The analyst noted that the Niobrara is located at shallower depths in the Piceance than in the Haynesville and thus, the well cost is less, which combined with similar initial production rates equates to better economics.
>
> As Carl will discuss, the indications of our wells to date support this preliminary conclusion. We have initial production from the 2B well and expect higher rates from the 2C well, which is all of the pay of the 2B well plus an additional 2,800 feet of gross interval to complete.
>
> I believe our strategy to dedicate all our efforts in capital to the Vega Area was a correct one and is being validated with the results, not just from our wells, but from other operators as well. As mentioned in our press release, we have decided to market for sale our non-operated properties in Texas and the DJ Basin in order to raise capital to drill 2 additional wells in the Vega Area targeting the Mancos and Niobrara shales. These 2 additional wells to be drilled are wells that will hold leasehold so they will be accomplishing two objectives: First, to continue to quantify and confirm the reserves and economics of the shale formations; and second, to secure our acreage position in the Vega Area.

* * *

***As I mentioned in the last conference call, I'm expecting a very promising year for Delta and what I've seen to date only heightens my expectations.***

(emphasis added).

113.   Lakey commented on the results by stating, in relevant part:

Delta did have another strong quarter. The focus on our core assets is being validated in the numbers. The improvement is related to numerous items, which Kevin will share with other financial metrics shortly.

As proud as I am of these financial results, I really want to share why we are so excited about our shale wells. As we've announced previously, the information we have gathered to date continues to raise our expectations on the resource that exists in the shales of the Williams Fork.

In fact, we believe the resource will exceed that of the Williams Fork and our field, and based on our findings and other published information, perhaps across much of the Piceance Basin. The 2B wells drilled through a portion of the Mancos formation have reached a total depth of 10,700 feet. We've completed roughly 1,200 feet of gross pay in the upper Mancos and Corcoran formations only. This represents only 33% of the shale play identified in the 2C well.

* * *

***As Dan mentioned earlier, our results are validating our strategy of focusing on the profitability of future potential of our core assets in the Piceance Basin.*** Divestiture of our remaining non-operated assets will allow further investigation of the shales and additional portions of our acreage position to be secured. In anticipation of the successful sale transaction, we have initiated work on a fourth well to test the shales in the Vega Area. This well, as planned, will spread in Q3 in Section 17 of 9 South 93 West and will also test intervals from the shales below the Williams Fork. We expect the 4 wells collectively will demonstrate a productive cross-bearing section across our acreage position of roughly 5 miles from west to east. We believe, based on internal studies, that a similar cross-section of productive shales can be demonstrated in the north-south orientation also. I will now ask Kevin to expound on the financial metrics that would validate another successful quarter for Delta's business.

(emphasis added).

46

114.    In truth, Delta was experiencing significant liquidity problems and was struggling just to remain a going concern.   CI 2 recalled that during this period Delta was unable to pay its vendors and estimated that Delta held $500,000 to $1.2 million in payments each month.   CI 2 recalled that Delta's financial situation got even worse in the beginning of 2011, as the number of checks being held increased to around 25 to 30 at a given time. CI 1 and CI 6 also attested to significant liquidity issues at Delta during this time.   In fact, CI 1 recalled that in May 2011 Delta's auditors told the Company's executives and Board members that "bankruptcy was a real risk."   Additionally, CI 5 explained that by spring 2011, Delta was aggressively seeking investments and was attempting to sell its assets.   "Delta needed to pay its debts. That was the point of the asset sales," CI 5 said.   In describing the Company's strategic alternative process, CI 5 described that Delta's management was "*talking about anything that would stick to the wall*."

115.    At this time Delta's Vega Area assets were impaired.   Delta was deeply in debt and did not have the liquidity to develop the properties.   Not only was Delta experiencing severe cash flow shortages, but Defendant had knowledge that Opon had terminated the $400 million asset purchase based on its substantially lower valuation of the assets.   Moreover, by this time CI 2 recalled hearing talk in Delta's executive offices that Delta was going bankrupt and further recalled rumors that Delta was making its numbers look better to investors than they actually were.   Indeed, it was in May 2011 that Delta's auditors warned of bankruptcy as a real risk, according to CI 1, and it was in the spring that CI 5 described Delta's desperate attempts to find any strategic alternative.

116.   On June 17, 2011, Delta issued a press release entitled "Delta Petroleum Corporation Signs Definitive Agreement to Sell Remaining Non-Core Assets for $43.2 Million and Provides an Update on the 2C Well," which stated in part:

> Carl Lakey, Delta's CEO, commented, "***As we discussed on our last conference call, the expected proceeds from the sale of these non-core assets will allow us to fund current and future drilling activity in the Vega Area and reduce our senior secured debt balances.*** Our borrowing base with Macquarie will decrease by $22 million to $33 million as a result of the sale.   The sale of the remaining non-core assets makes Delta essentially a pure Piceance Basin company.  The Vega Area has been and will remain the focus of the Company's capital and efforts."

(emphasis added).

117.   However, as explained in the Young Declaration, it was around this time that "[t]here did not appear to be . . . a realistic option to incur debt that would allow for existing indebtedness to be refinanced and provide enough liquidity to allow the Debtors to operate ***for more than nine months at most***." (Emphasis added).

118.   On July 6, 2011, Delta issued a press release announcing initiation of a strategic alternatives process, which stated in part:

> Carl Lakey, Delta's President and CEO stated, "With the June 28 closing of the $43.2 million sale of non-core, non-operated assets located in Texas and the DJ Basin, Delta has now completed the transformation to become essentially a pure Piceance Basin company.   Initial production results from the 2C well are expected in the near future, and further information will likely be obtained throughout the strategic alternatives process.   ***These developments and continued expansion of the shale analogs from offset competitor activity coupled with geologic confirmation information expected from the currently drilling 12B-6-14D well, make this the right time to initiate a strategic alternatives process for the transformed Delta to explore the value of our approximately 22,000 net acres of Williams Fork and deeper shale resource.***"
>
> The Delta Board of Directors has engaged Macquarie Capital (USA) Inc. and Evercore Group, L.L.C. to act as advisors to the Company in conducting a strategic alternatives process that will be aimed at maximizing shareholder value and dealing with 2012 debt maturities. Through this

process, the Board of Directors intends to evaluate all opportunities available, including a potential sale of the Company.

(emphasis added).

119.    On July 12, 2011, the shareholders of the Company approved a one-for-ten reverse split of the Company's common stock which became effective on July 13, 2011.

120.    On August 4, 2011, Delta issued a press release announcing its second quarter 2011 financial results. In the August 4, 2011 press release the Company also reported proved reserves in the amount of $695.2 million and unproved properties in the amount of $230 million, less depletion.   The release stated in part:

> Carl Lakey, Delta's CEO and President stated, "***We are pleased to provide our shareholders with another solid operating quarter coupled with the accomplishment of some very important strategic steps.   We sold our remaining non-core assets, which reduced our leverage and provided <u>sufficient liquidity to continue our deep shale evaluation and development in the Vega Area.</u>*** While the strategic alternatives process, the 2C well results, and the Netherland Sewell report were all announced subsequent to the end of the quarter, much of the efforts that went into those steps occurred in the second quarter.   The 2B and 2C well results and Netherland Sewell's report are very important contributions that support Delta's intrinsic value and aid our strategic alternatives process."

(emphasis added).

121.    On August 4, 2011, the Company filed with the SEC its Form 10-Q for the second quarter ended June 30, 2011, which reiterated its financial results announced in the earnings release.

122.    That same day, the Company held a conference call with investors, analysts, and other market participants to discuss Delta's financial results for the first quarter 2011.   During the conference call, Defendant Taylor, in relevant part, stated:

> First, are the results thus far of our 2C well on the Vega Area. Carl will discuss the specifics of that well and its results to date in greater detail. But needless to say, we're very excited about what we are seeing in this well, the potential it holds and what it means for Delta. While the process to get

to this point took longer than we anticipated, we are pleased to have a flowing well that is in the process of confirming substantial quantities of economic reserves in the deeper shale formations of the Piceance Basin.

\* \* \*

We fully believe that our total resource recently evaluated by Netherland Sewell, coupled with current market conditions, will be driving the valuations in the strategic alternatives process. Our current distressed market valuation levels should not be considered as constraints during the process.

***Delta is currently trading at an amazing 50% discount to the lowest of these transactions at only $0.16 per Mcfe of our 2P reserves from the Williams Fork alone. The additional resource of the deeper shale only make our current valuation even more attractive.*** We believe there is not a better time to be running our strategic alternatives process.

(emphasis added).

123.   Lakey commented on the results by stating, in pertinent part, as follows:

***I absolutely share your enthusiasm about our progress at Delta. For the past of couple of weeks, I've been looking forward to this conference call.*** Although Delta delivered another solid quarter, I will defer to Kevin to demonstrate this when he discusses the financial metrics achieved. There is so much more to share with you today.

I will start my remarks with a short update on the 2C well. Initial production from 2C certainly took longer than expected due to previously disclosed mechanical difficulties and more recently, equipment availability. But early results confirm the exciting potential of the shales under the Williams Fork formation. We have already shared with you that production began on July 20 and sales started on July 21. Peak production was obtained on July 28 at 5.4 million cubic feet per day with 8,360-psi flowing tubing pressure on a 7/64-inch choke.

Production has generally ranged between 2.5 million and 3.5 million cubic feet a day at choke restricted rates between then and now. The choke has been opened in 2 small incremental steps and is currently at 9/64 of an inch, with the last 24 hours averaging 6,100-psi flowing tubing pressure and 3 million cubic feet per day.

Lab analysis shows that the oil produced in late July was 38 degrees API gravity with essentially no sulfur content. There has been little to no oil since that time, but shifting water chemistry and changing gas composition suggest that some of the deeper frac stages are just beginning to contribute to production. These are the intervals that the logs suggest would be where

we should expect heavier hydrocarbons to be recovered. In the 2-week producing weeks, we have recovered less than 5% of our frac load to date.

I want to emphasize to everyone that this well is certainly capable of much greater production rates than we are allowing. We are intentionally being conservative with our small choke settings to limit the drawdown on the reservoir. We believe this management technique will improve our ultimate recovery from the well.

* * *

When Netherland Sewell evaluated the shale resource at Vega, their higher upside estimate of 10 Bcf gross recoverable per well and 80-acreage drainage patterns equates to 2.8 Tcfe gross recoverable for horizontal development. Using their low side estimate of 6 Bcfe per well with 168-acre drainage patterns equates to 0.84 Tcfe. These estimates are accretive to the Williams Fork recoveries.

Finally, if Delta can find an economic way to develop these shales in a vertical wellbore, the ultimate resource could be larger still. We think 2C is a great start in that effort.

***Now with the shale discussion concluded for now, let me now direct my comments towards the transformed Delta that we have become. Delta has worked hard over the past year to put its house in order. I am so proud of our current team and our former teammates that worked hard on these accomplishments.*** I would like to share a few of them with you now to help you understand that sense of accomplishment with me.

First and foremost, we have paid down roughly $106 million of debt in the past 13 months and initiated a new bank facility with Macquarie. This was largely enabled through 2 non-core asset divestiture transactions totaling $173 million of gross proceeds. In addition, we eliminated non-core, non-producing assets and liabilities across the remaining Delta portfolio as we have become even more focused on Vega as our core asset. That asset is -- that work is now also essentially complete.

Delta has worked hard to reduce our Vega LOE from year-ago levels by roughly 60%. We have reduced our normalized G&A by approximately 35% from year-ago levels.

The team at Delta was not content with simply eliminating cost and liability. We also looked at ways to create upside value. The team stewarded a very limited capital investment budget with a strategic eye. We increased per well EUR by 22% in the Williams Fork and created economic development opportunities in the current price environment.

The team also accomplished with the deployment of a portion of that same limited capital budget -- we have discovered, confirmed and are starting to quantify a shale resource below the Williams Fork that could someday exceed that of the Williams Fork. Lastly, we retained one of the finest independent engineering firms in Netherland Sewell to help the company quantify the value of its -- of this work in anticipation of the strategic alternatives process. It turned out to be significant.

Taken collectively, it should be clear that our focus on our clear asset has improved our company in many important metrics. As I reflect on Delta's transformative body of work, I am so proud of our team and what Delta has become. I hope you now have a sense of the excitement that I feel every day.

***This work was essential to build value in the core asset of the company for our shareholders. Dan earlier pointed out that our current share price is apparently not in alignment with the value of the asset and the company. I hope this helps you understand why we feel this way***.

With these accomplishments in clear focus, I'm sure you can appreciate that we feel we have created the best value environment possible as we move forward with the strategic alternatives process. ***I am confident that our advisors at Macquarie and Evercore are keenly focused on taking these accomplishments and translating them into value for our shareholders.***

(emphasis added).

124.  In truth, Delta was just barely managing as a going concern and was desperately seeking a strategic alternative just to avoid bankruptcy.  In addition to the aforementioned cash flow problems, CI 1 recalled that in May 2011 Delta's auditors told the Company's executives and Board members that "bankruptcy was a real risk." Indeed, CI 5 described a strategic alternatives process so desperate that Delta's management were "talking about anything that would stick to the wall."  In fact, by this point, "[t]here did not appear to be . . . a realistic option to incur debt that would allow for existing indebtedness to be refinanced and provide enough liquidity to allow the Debtors to operate for more than nine months at most."  As Young described it, "no one was

interested in making such an investment given that [Delta] had substantial debt maturities looming less than a year away that would likely, in the opinion of such participants, cause such equity investments to be diluted, and that natural gas prices had continued to decline, decreasing the value of the Debtors' assets."

125.    At this time Delta's Vega Area assets were impaired.   Delta was deeply in debt and did not have the liquidity to develop the properties.   Moreover, Opon had terminated the $400 million asset purchase based on its substantially lower valuation of the assets.

## THE TRUTH IS REVEALED

126.    On November 9, 2011, Delta announced its third quarter 2011 financial results.   The Company reported a net loss of ($429.4) million, or ($15.40) diluted EPS, for the quarter ended September 30, 2011.   The significant loss was due mostly to costs associated with drilling dry holes.   The corresponding Form 10-Q filed with the SEC described the dry hole costs, in pertinent part, as follows:

> **Dry Hole Costs and Impairments.** Delta incurred dry hole and impairment costs of $420.4 million for the three months ended September 30, 2011 compared to ($1.2 million) for the comparable period a year ago. During the three months ended September 30, 2011, proved and unproved property impairments to the Rocky Mountain region of $420.1 million were recognized. ***During the three months ended September 30, 2011, the Company evaluated the fair value of its properties based on market indicators in conjunction with the progression of the strategic alternatives evaluation process. Delta has not received any definitive offer with respect to an acquisition of the company or its assets that implies a value of the assets that is greater than its aggregate indebtedness.*** As a result, the Company recorded an impairment of $157.5 million to its Vega unproved leasehold, $239.8 million to its Vega area proved properties, $20.5 million to its Vega area gathering system and facilities, and $2.1 million to its Vega area surface acreage. During the three months ended September 30, 2010, dry hole and impairment costs were a result of minor cost true-ups.

(emphasis added).

127.   A November 9, 2011 press release additionally provided an update on Delta's strategic alternatives process, advising that the Company had not received any offers to purchase the Company or its assets.   As a result, Delta would be forced to restructure its indebtedness.   Delta further warned investors that should it be unsuccessful in achieving a transaction or transactions addressing the Company's liquidity, it would be forced to seek protection under Chapter 11 of the U.S. Bankruptcy Code.   The press release stated, in relevant part, as follows:

**Strategic Alternatives Update**

In July 2011, the Board of Directors of the Company announced that it had engaged Macquarie Capital (USA) Inc. and Evercore Group, L.L.C. to act as advisors to the Company in conducting a strategic alternatives process in order to maximize shareholder value and address the 2012 debt maturities.   In the strategic alternatives process, the board of directors has considered a wide variety of possible transactions, including the sale of the company, issuances of equity or debt securities, sales of assets, joint ventures and volumetric production payment financing, as well as other potential corporate transactions.   ***With respect to a potential sale of the company or its assets, the Company solicited offers from a significant number of potential purchasers, including domestic and foreign industry participants and private equity firms, and has engaged in substantive negotiations with several such potential purchasers.   However, the Company has not received any definitive offer with respect to an acquisition of the company or its assets that implies a value of the assets that is greater than its aggregate indebtedness, and has not been able to identify any significant source of additional financing that is likely to be available on acceptable terms.   Accordingly, based on the results of the process to date, the Company believes that a restructuring of the Company's indebtedness is likely to be necessary.***   The Company is continuing to discuss potential transactions with potential purchasers and expects to engage in discussions with certain holders of its outstanding senior notes.   There can be no assurance that these discussions will lead to a definitive agreement on acceptable terms, or at all, with any party.   Any transaction that is agreed to could be highly dilutive to existing stockholders.   If the Company is unsuccessful in consummating a transaction or transactions that address its liquidity issues, the Company

> will be required to seek protection under Chapter 11 of the U.S. Bankruptcy Code.
>
> On November 2, 2011, Delta appointed John T. Young, Jr. as its Chief Restructuring Officer.  Mr. Young is a Senior Managing Director at Conway MacKenzie, Inc., which Delta has retained to assist with its strategic alternatives process.  Mr. Young has substantial knowledge and experience providing restructuring advisor services, including interim management and debtor advisory, bankruptcy preparation and management, litigation support, post-merger integration and debt restructuring and refinancing. Mr. Young's experience also includes serving in a multitude of advisory capacities within the energy and oilfield services industries.

(emphasis added).

128.   On this news, Delta stock collapsed $1.34 per share to close at $0.71 per share on November 10, 2011, a one-day decline of 65% on volume of nearly 4.5 million shares.

129.   Indeed, as a result of Defendant's false statements and omissions, Delta's publicly traded securities traded at artificially inflated prices during the Class Period. However, after the above revelations entered the market, the Company's shares were hammered by massive sales, sending them down 94% from their Class Period high.

## LOSS CAUSATION

130.   The disclosure of the events described in the November 9, 2011 press release and Form 10-Q corrected each of the statements alleged to be false and misleading herein, including, Defendant's statements and omissions concerning the reasons behind the termination of the Opon deal.

131.   While Delta announced that in the fourth quarter 2009 and first quarter 2010 cash flow and liquidity had improved, the announcement was only tenable on its face due to proceeds received from a litigation settlement. In fact, neither the Company's liquidity

nor its cash flow had improved materially.   As of December 31, 2009, Delta had just $14 million in cash and equivalents on its balance sheet.   As of the end of March 2010, it had $93 million due on one credit facility and $83 million on another.   It also had senior notes coming due in May 2012 in the amount of $115 million.   There are three primary sources of cash flow to the Company – cash from operations (*i.e.,* net income); cash from investing activities (proceeds from the sale of property, plant, equipment); and cash from financing activities (proceeds from additional debt/equity).   In the quarter ended March 31, 2010, Delta reported net negative cash flow of $41 million.   Delta did not anticipate that cash flow from operations would be sufficient to meet its debt obligations and fund ongoing development of its core asset.   Thus, the sale of the the Company's assets at an acceptable price was crucial to continuing as a going concern.

132.   In November 2009, Delta announced that it had retained investment bankers to assist in evaluating strategic initiatives that would enhance shareholder value. In March 2010, it announced it had entered into an asset sale agreement with Opon for 37.5% of its non-operated working interest in the Vega Area assets for $400 million.   The Vega Area assets were Delta's most important asset.   As explained by Delta's Chief Restructuring Officer, Delta's "core asset and primary area of activity is in the Vega Area of the Piceance Basin."   Young Declaration at 6.   Delta's Chief Restructuring Officer further explained that "[a]s [Delta] scaled back [its] operations as further described below, [Delta] streamlined their businesses to focus on the Vega Area. ***As of December 31, 2010, the Vega Area comprised approximately 84% of [Delta's] proved reserves and with its undeveloped leasehold potential comprises virtually all of their long-term growth prospects***." Young Declaration at 8 (emphasis added).

133.    The announced deal with Opon was important for the Company, as it struggled with liquidity and cash flow issues. It would also provide capital to develop the Vega Area assets, as Delta's credit facility covenants restricted capital expenditures. Following the announcement of the deal, Reuters commented as follows:

> The deal comes as a breather for the company, which late last year had said it was looking at strategic initiatives including the possible sale of some or all of the company's assets, partnerships and joint venture opportunities. The company said it will retain operations of the Vega Area subject to a joint venture agreement with Opon, and plans to use $225 million of total consideration to develop Vega Area over the next three years. The remaining consideration will be used for balance sheet operations and general working capital purposes, it added.[13]

134.    After putting a "positive" spin on the deal going well, and extending the June deadline for getting the deal done, Delta abruptly announced on July 7, 2010 that it had terminated the transaction with Opon due to Opon's inability to secure financing.[14]   At no time did Defendant tell the investing public that Opon had retracted its original offer and was instead only willing to follow through with the Vega Area purchase if Delta would accept a much lower purchase price that would not have provided Delta with sufficient proceeds to pay down debt and fund its operations.

135.    The misleading statements regarding the Opon transaction enabled Delta to obtain the financing it needed to limp along for another year in a desperate attempt to stave off bankruptcy, while it duped investors with an inflated asset on its balance sheet. Indeed, Delta was waiting for the sale to go through to allow the Company to renegotiate

---

[13] Reuters News, "Update 2 – Delta to sell part of Piceance acreage for $400 mln," March 18, 2010.

[14] During the quarterly teleconference with analysts on May 11, 2010, Defendant Daniel Taylor represented that the sale process was going well.

its credit facility.[15]   An admission that its core asset was impaired at this time would have put the Company on the brink of default, essentially equivalent to its financial condition in November 2011.   To be sure, following the termination of the Opon deal, and without admission of an impairment at this time, Standard & Poors ("S&P") revised its outlook for Delta to negative because of "uncertainty after a $400 million asset sale deal fell through."[16]   S&P said that without the sale Delta was "less likely" to meet certain debt maturities.   Had the market known the full truth, that Delta's core assets were substantially overvalued, and that the deal was terminated for reasons other than financing issues, it is likely that its credit facilities would not have been successfully renegotiated and it would have been forced to seek a restructuring earlier than December 2011.

136.   One year later, on July 6, 2011, Delta announced it was again pursuing strategic alternatives, including a possible sale of the Company to deal with its impending debt maturities.   Having sold its remaining non-core assets in June 2011, the Vega Area assets were left, still being carried at inflated values on its balance sheet.   Consolidated net cash flow for the six months ended June 2011 was negative $10 million.   Delta had just $2 million in cash at the end of the third quarter, and its credit facility was coming due in January 2012 and senior notes in May 2012.

137.   Finally, having run out of options, the Company revealed as follows on November 9, 2011:

*With respect to a potential sale of the company or its assets, the Company solicited offers from a significant number of potential purchasers, including*

---

[15] Defendant Kevin Nanke told analysts during the Q1 call on May 11, 2010 that Delta was in negotiations with its bank for a new credit facility once the Opon transaction was completed.

[16] DJNS, "S&P Gives Delta Petroleum Negative Outlook On Deal's Collapse," July 13, 2010.

*domestic and foreign industry participants and private equity firms, and has engaged in substantive negotiations with several such potential purchasers. However, the Company **has not received any definitive offer with respect to an acquisition of the company or its assets that implies a value of the assets that is greater than its aggregate indebtedness**, and has not been able to identify any significant source of additional financing that is likely to be available on acceptable terms. Accordingly, based on the results of the process to date, the Company believes that a restructuring of the Company's indebtedness is likely to be necessary.*

*During the three months ended September 30, 2011, the Company **evaluated the fair value of its properties based on market indicators in conjunction with the progression of the strategic alternatives evaluation process. Delta has not received any definitive offer with respect to an acquisition of the company or its assets that implies a value of the assets that is greater than its aggregate indebtedness**. As a result, the Company recorded an impairment of $157.5 million to its Vega unproved leasehold, $239.8 million to its Vega area proved properties, $20.5 million to its Vega area gathering system and facilities, and $2.1 million to its Vega area surface acreage.*

(emphasis added).

138.    Thus, the concealed risks that were evident to Defendant in July 2010, namely that the Vega Area assets were worth far less than the Company led investors to believe and that the Company would not be able to meet or refinance its debt obligations, materialized a year later, and became known to the investment community.

139.    Accordingly, the November 2011 corrective disclosures/events corrected Defendant's material misstatements and/or omissions regarding the Opon transaction in two ways.

140.    First, Defendant and the Company's admission that its Vega Area assets were impaired to the tune of $420 million corrected the valuation of the assets based on the $400 million Opon offer price.   Based on Defendant's announcement of Opon's acquisition of 37.5% of the Vega Area assets for $400 million, investors were led to think that the Vega Area assets were worth approximately $1 billion ($400 million divided by

.375) and were left to believe that the Vega Area assets were marketable at that price. Had Defendant disclosed that Opon retracted its $400 million offer based on its much lower valuation, investors would have had knowledge that the assets, proposed to be sold to Opon, were likely not worth the $400 million price.   Because Defendant never disclosed that Opon retracted its $400 million offer (following Opon's due diligence), investors' inflated valuation of the Vega Area assets was internalized and persisted throughout the Class Period.   Investors' artificially high valuation of the Vega Area assets was corrected when Defendant and the Company acknowledged that the assets were impaired based on the fact that the assets were not worth a price greater than Delta's liabilities.   As the corrective disclosures explained, "[d]uring the three months ended September 30, 2011, we evaluated the fair value of our properties based on market indicators in conjunction with the progression of the strategic alternative evaluation process.   We have not received any definitive offer with respect to an acquisition of the Company or its assets that implies a value of the assets that is greater than our aggregate indebtedness.   As a result, we recorded an impairment …."

141.   Second, the November 9, 2011 press release disclosed for the first time the materialization of the undisclosed risk associated with Opon's lower valuation (following due diligence) by disclosing that the attempted strategic alternatives had failed.   Indeed, Defendant's misstatements regarding the Opon transaction concealed the risk that the Vega Area assets were not marketable for as high a price as investors were led to believe nor as high a price as Delta needed in order to avoid bankruptcy and continue as a going concern.

142. Because the Vega Area assets were Delta's primary and most valuable assets, the likelihood that these assets would not generate serious offers (let alone offers close to the valuation implied by the $400 million Opon offer price) was directly related to Delta's inability to continue its operations. The Company was not generating sufficient cash flow, and it, therefore, needed to sell its assets to avoid bankruptcy. Indeed, Young's Declaration, which was filed in the bankruptcy proceeding to explain the Company's substantial indebtedness and eventual need to file for bankruptcy protection, goes into considerable detail about the Company's strategic alternatives process and the direct impact it had on Delta's inability to continue as a going concern. *See* Young Decl. at ¶¶39-49. Young's Declaration, therefore, provides a compelling basis for Plaintiff's assertion that the losses caused as a result of Delta's November 9, 2011 disclosure are directly attributable to the fact that Delta's core assets were not marketable at, or apparently near, the carrying value of the Vega assets.

143. While Defendant, who was privy to all information, could have and was able to appreciate that bankruptcy was all but inevitable, investors were left in the dark based on Defendant's material misstatements and/or omissions. Accordingly, Defendant's November 9, 2011 press release related back to the materially misleading Opon announcement because the press release corrected investors' inflated valuation of the Vega Area assets as well as the marketability of those assets for a price near carrying value.

## DELTA FILES FOR BANKRUPTCY

144. On December 16, 2011, Delta issued a press release announcing that it, along with certain of its subsidiaries, had filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on December 15, 2011. The release stated in part:

"After reviewing all of our alternatives, the Company's management and Board of Directors, working in consultation with outside legal and financial advisors, unanimously determined that the Chapter 11 process would provide the opportunity for the best result for our creditors, shareholders, suppliers, employees and customers.  We are committed to diligently working for all of our stakeholders to achieve the best possible outcome from this process," said Carl E. Lakey, Chief Executive Officer and President of Delta.

The Company anticipates that its current and future cash resources will be sufficient to pay its court expenses and maintain its business operations in the short-term.  Additionally, the Company will seek Court approval of a debtor in possession (DIP) financing facility of $57.5 million arranged by it to address longer term liquidity needs as it works through the bankruptcy process.

The Company is also seeking, and expects to receive, approval from the Bankruptcy Court for a variety of other motions it will file, including, but not limited to, requests to pay employee wages, salaries and employee benefits, royalty interest owners, and vendors who are to the continued operation of the Company's business.

145.   As a result of the Delta's bankruptcy the Company's common shares were cancelled and shareholders received nothing.

## ADDITIONAL ALLEGATIONS OF SCIENTER

146.   Defendant was motivated to issue materially misleading statements in an attempt to present potential strategic partners/purchasers with an appealing investment.

147.   Defendant Taylor was motivated to prevent Delta from declaring bankruptcy based on his executive position at Tracinda.   Tracinda is Delta's largest shareholder, owning approximately 33% of the Company at the end of the Class Period.   Defendant Taylor's primary responsibility at Tracinda is to manage Tracinda's investments.[17]   Given that Taylor was largely responsible for overseeing and managing Tracinda's investments and given Tracinda's large investment in Delta, it would certainly have been contrary to

---

[17]  *See* Delta's 2010 Proxy Statement, filed with the SEC on May 17, 2011.

Defendant Taylor's interests to have Delta file for bankruptcy since to do so would create a substantial loss for Tracinda.   Indeed, as a result of Delta's bankruptcy, the Company's common shares were cancelled, leaving its shareholders with nothing.

148.   Bankruptcy was, indeed, a real possibility for Delta throughout the Class Period.[18]   As Young explained, Delta's defaults on certain debt covenants in March 2010 "accelerated Delta's need for cash, which could be done most quickly through a divesture of certain assets."[19]   Indeed, Young described that Delta's July 30, 2010 asset sale to Wapiti was necessary "due to the need to repay indebtedness" and was therefore completed despite the fact that the transaction was "toward the lower end of the anticipated value of the assets."[20]   Proceeds from the Wapiti transaction were used to reduce indebtedness and to extend the maturity date of the MBL Credit Facility from January 15, 2011 to January 31, 2012.[21]   As such, the July 2010 Wapiti transaction largely just delayed the maturity of Delta's debts rather than providing a solution to the Company's financial problems.   Defendant and Delta, therefore, continued to review various strategic alternatives including, but not limited to, reorganization, sale of separate operating units, sale of each of the Company and its subsidiaries as a whole, and liquidation.[22]

---

[18]  This is evidenced by Delta's consistent "going concern" discussions contained in its SEC filings throughout the Class Period.

[19]  Young Declaration at ¶41.

[20]  *Id.*

[21]  *Id.* at ¶43.

[22]  *Id.* at ¶44.

149.   As numerous CIs explained, by the spring and summer of 2011, Delta's executives were to the point of scrambling to find strategic alternatives in a last ditch effort to avoid bankruptcy.   Indeed, the Company's substantial debts that were maturing in 2012 created an unworkable financial situation for Delta.   In fact, in May 2011, according to CI 1, Delta's auditors told the Company's executives and Board members (including Defendant Taylor) that "bankruptcy was a real risk," which made it imperative for Delta to obtain a strategic alternative.

150.   Accordingly, throughout June, July and August 2011, Delta was aggressively seeking investments and attempting to sell its assets. "***Everything and anything was considered to de-leverage the Company***," CI 1 said (emphasis added). In describing the Company's strategic alternative process during the spring and summer of 2011, CI 5 described that Delta's management was "***talking about anything that would stick to the wall***."

151.   As Young explained, in the spring of 2011, the Company began informal discussions with other oil and gas industry participants about a new equity investment. However, according to Young, "no one was interested in making such an investment given that [Delta] had substantial debt maturities looming less than a year away that would likely, in the opinion of such participants, cause such equity investments to be diluted, and that natural gas prices had continued to decline, decreasing the value of the Debtors' assets."[23]   Thus, according to Young, by June 2011, Defendant and Delta's executives were desperately seeking an asset sale, either as an aggregate sale or as multiple sales, "because there did not appear to be an entity either willing to make an equity investment

---

[23] *Id.* at ¶44.

of a substantial enough size to allow the Debtors to fund ongoing drilling operations for the next few years, ***nor a realistic option to incur debt that would allow for existing indebtedness to be refinanced and provide enough liquidity to allow [Delta] to operate for more than nine months at most***." (Emphasis added).   CI 1 similarly explained that Delta's executives and Board "***wanted to sell the Company or its assets rather than fix the balance sheet. Any strategic alternative was being pursued – a sale of the company, a sale of its assets or an investment for a percentage of the Company***."   Thus, Young described that beginning in July 2011, Delta's advisors sent initial marketing materials to approximately seventy-six (76) financial and strategic parties known to be interested in the oil and gas exploration.   However, Delta could not find any buyers.   "The main reason was gas prices," CI 1 said.

152.   Because Defendant and Delta were frantically looking for strategic partners and/or potential buyers to purchase some or all of Delta's assets throughout the Class Period—and during a time when natural gas prices were down—Defendant had no choice but to aggressively affirm the value of its assets while materially omitting that the asset sale to Opon was, in fact, terminated by Opon because of Opon's substantially lower valuation of Delta's assets, which led Opon to offer a "much tougher deal," according to CI 3.   By attributing the deal's incompletion to Opon's purported inability to obtain financing, Defendant signaled to potential strategic partners—and, consequently, to misled investors—that the announced $400 million price accurately reflected the value of those assets.   Defendant was also motivated to fail to report its assets as impaired despite the existence of Opon's significantly lower asset valuation, Delta's financial

inability to develop the oil and gas properties, and the persistently dismal gas prices in order to further Delta's search for strategic alternatives.

## NO SAFE HARBOR

153.   Delta's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

154.   The Defendant is also liable for any false or misleading FLS pleaded because, at the time each FLS was made, Defendant knew the FLS was false or misleading.   None of the historic or present tense statements made by Defendant were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendant expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

155.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Delta publicly traded securities during the Class Period (the "Class").   Excluded from the Class are defendant, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which they have or had a controlling interest, and any entity for which they acted as an investment manager, including Tracinda.

156.   The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial

benefits to the parties and the Court. Delta had over 28.8 million shares of stock outstanding at the time of its bankruptcy filing, owned by hundreds if not thousands of persons.

157.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the Exchange Act was violated by Defendant;

(b)    whether Defendant omitted and/or misrepresented material facts;

(c)    whether Defendant's statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendant knew or deliberately disregarded that his statements were false and misleading;

(e)    whether the prices of Delta publicly traded securities were artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

158.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendant's wrongful conduct.

159.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.   Plaintiff has no interests which conflict with those of the Class.

160.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against Defendant**

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    During the Class Period, Defendant disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.    Defendant violated §10(b) of the Exchange Act and Rule 10b-5 in that he employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Delta publicly traded securities during the Class Period.

164.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Delta publicly traded securities.   Plaintiff and the Class would not have purchased Delta publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendant's misleading statements.

## COUNT II

**For Violation of §20(a) of the Exchange Act
Against Defendant**

165.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166.   The Defendant acted as a controlling person of Delta within the meaning of §20(a) of the Exchange Act. By reason of his position with the Company, and his ownership of Delta stock, Defendant had the power and authority to cause Delta to engage in the wrongful conduct complained of herein.   By reason of such conduct, Defendant is liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding Plaintiff and the members of the Class damages, including interest;

C.      Awarding Plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:   July 17, 2015

FEDERMAN & SHERWOOD

/s/ William B. Federman
William B. Federman
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone:   (405) 235-1560
Facsimile:     (405) 239-2112
wbf@federmanlaw.com

-and-

2926 Maple Ave., Suite 200
Dallas, TX   75201

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2015, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ William B. Federman
William B. Federman